# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EMILY'S LIST,

    Plaintiff,

    v.

FEDERAL ELECTION COMMISSION,

    Defendant.

Civil Action No. 05-49  (CKK)

## MEMORANDUM OPINION
(February 25, 2005)

Presently before the Court is a Motion for Preliminary Injunction filed against the Federal Election Commission ("FEC") by Plaintiff EMILY's List, an organization that recruits and funds pro-choice women candidates for political office.  Plaintiff, a political committee registered with the FEC, is challenging regulations promulgated by the Federal Election Commission to implement the provisions of the Federal Election Campaign Act of 1971, Pub.L. No. 92-255, 86 Stat. 3, ("FECA"), as amended, including the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ("BCRA").  These regulations modify the rules governing how political committees can allocate spending between federal[1] and nonfederal[2] accounts, and modify the definition of "contribution" as used in FECA.  Plaintiff seeks to enjoin the application of these regulations, which went into effect on January 1, 2005.

---

[1]Federal funds are also referred to as "hard money," which consists of funds intended for use in conjunction with federal elections that must be raised from sources and in amounts permissible under FECA.

[2]Nonfederal funds are also referred to as "soft money," which consists of funds that are raised outside of the source and amount limitations imposed by FECA, and are not intended for use in conjunction with federal elections.

The regulations at issue are based on provisions in FECA, but not on the amendments to FECA included in BCRA. The amendments undertaken via the enactment of BCRA governed the operation of party committees and candidates, rather than nonparty political committees such as EMILY's List. However, BCRA, and the Supreme Court's subsequent decision in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003), upholding BCRA's major provisions, necessarily informed the FEC's approach to the regulations at issue in this suit, which govern solicitation and expenditures by political committees such as Plaintiff.

After a careful examination of Plaintiff's Motion, the parties' briefs and the relevant law, the Court finds that Plaintiff's Motion for Preliminary Injunction shall be denied.

## I.    BACKGROUND

### A.    *Regulatory Framework*

The District Court's *per curiam* opinion in *McConnell v. Federal Election Commission* contains a fulsome discussion of the history of campaign finance law in the United States. *See McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176, 188-206 (D.D.C. 2003). The Court will briefly summarize the backdrop to the instant litigation. The overarching purpose of the Federal Election Campaign Act of 1971, has been to place limitations on contributions and expenditures in connection with federal elections. *See McConnell*, 251 F. Supp. 2d at 193. However, "[d]espite the passage of FECA, the 'infinite ability' to 'eviscerate[] statutory limitations on contributions and expenditures,' which amounted to 'wholesale circumvention' became a source of further congressional concern." *Id.* (quoting *Buckley v. Valeo*, 519 F.2d 821, 837, *aff'd in part, rev'd in part*, 424 U.S. 1 (1976)). In 2002, Congress enacted the BCRA, which amended FECA. BCRA was intended to stem the tide of nonfederal funds being

improperly used to influence federal elections.  Although existing campaign finance laws were intended to prevent soft money from being used to influence federal elections, the circumvention of these laws had become routine, resulting in unregulated funds being used to influence federal elections.

The FEC's rules which were in effect until June 2005, permitted non-party committees (including EMILY's List[3]) to allocate spending for administrative expenses and generic voter drive activity (as opposed to candidate-specific disbursements) pursuant to the "funds expended method."  11 C.F.R. § 106.6(c) (2002).  Under this approach, "expenses shall be allocated based on the ratio of federal expenditures to total federal and non-federal disbursements made by the committee during the two-year federal election cycle. . . .  In calculating its federal expenditures, the committee shall include only amounts contributed to or otherwise spent on behalf of specific federal candidates."  § 106.6(c)(1) (2002).  In contrast, prior to the enactment of BCRA, party committees allocated their expenses for "mixed" federal and nonfederal expenses by fixed percentages.  *See* § 106.5(b)(2)(i), (ii) (2002); § 106.5(d)(1)(i) (2002).

From 1991 until BCRA went into effect, party committees functioned under these allocation rules.  During this period, party committees routinely circumvented the spirit of campaign finance laws in order to use soft money to influence federal elections, and Congress

_____

[3]EMILY's List is a "nonconnected committee" withing the meaning of 11 C.F.R. § 106.6(a), which states that "'nonconnected committee' includes any [political] committee which conducts activities in connection with an election, but which is not a party committee, an authorized committee of any candidate for federal election, or a separate segregated fund."  11 C.F.R. § 106.6(a).  A "political committee" is "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year . . . ."  2 U.S.C. 431(4)(A).

ultimately determined that the existing allocation system was not effective at limiting party committees' spending of nonfederal funds to nonfederal activities.  Instead, Congress determined that the allocation system in fact enabled the circumvention of the law by authorizing the spending of soft money on activities that were intended to, and in fact did, influence federal campaigns.  *See McConnell*, 251 F. Supp. 2d at 651 (Kollar-Kotelly, J.) (noting that FEC regulations permitted widespread use of nonfederal money by party units to influence federal elections).

In enacting BCRA, Congress sought to modify the flawed regime by banning national party committees from raising or spending any nonfederal funds.  *See* 2 U.S.C. § 441i(a).  State party committees were permitted to raise nonfederal funds for nonfederal races, but were precluded from spending nonfederal funds on advertisements that "promote, support, attack or oppose" federal candidates.  § 441i(b)(1); § 431(20)(A)(iii).  BCRA permitted state parties to fund voter mobilization activities with an allocated mixture of federal funds and limited, regulated nonfederal funds.  § 441i(b)(2).

BCRA was challenged, and ultimately upheld by the Supreme Court.  *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003).  In considering BCRA's provisions, the Supreme Court found that the FEC's allocation rules undermined FECA, and that voter mobilization and generic activities clearly benefitted federal candidates.  *See id*. at 167-68.  The Court also stated that "[b]ecause voter registration, voter identification, [Get-Out-the-Vote], and generic campaign activity all confer substantial benefits on federal candidates, the funding of such activities creates a significant risk of actual and apparent corruption."  *Id*. at 168.  The Court found that the FEC's pre-BCRA system for allocating such voter mobilization spending "invited widespread

circumvention" of the law by permitting soft money to flow through political parties into federal elections. *Id*. at 145. In light of this, the Supreme Court upheld the provisions of BCRA that ended party committee allocation. *Id*. at 186-89.

Although the Supreme Court's decision addressed allocation with respect to party committees, the FEC undertook rulemaking in 2004 aimed at curbing the similar use of funds by non-party committees as well. The "funds expended" allocation method allowed non-party committees to calculate the federal portions of their allocated spending at or close to zero. *See, e.g.*, Admin. Record, Ex. 1 (Letter to FEC from Democracy 21) at 2; *id*. Ex. 10 (Facsimile to FEC from Democracy 21) at 2-3; *id*. Ex. 266 (Letter from McCain, Feingold, Shays, Meehan to Mai T. Dinh). Under this method, groups were not subject to a minimum federal allocation percentage. *See* 11 C.F.R. § 106.6 (2002).

In February 2004, the FEC issued Advisory Opinion 2003-37, stating its position that political committees were required to pay for any public communication that "promotes, supports, attacks, or opposes" federal candidates with federal funds. The FEC simultaneously indicated its intention to undertake rulemaking with respect to the allocation rules affecting non-connected political committees. On March 11, 2004, the FEC published its official Notice of Proposed Rulemaking ("NPRM"), which was framed largely in response to the Supreme Court's holding in *McConnell*. *See* 69 Fed. Reg. 11,736-38. The NPRM sought comment on "whether either BCRA or *McConnell* requires, permits, or prohibits changes to the allocation regulations for separate segregated funds and nonconnected committees." Political Committee Status, 69 Fed. Reg. 11,736, 11,753 (March 11, 2004) (discussing proposed 11 C.F.R. § 106.6). The NPRM questioned

Given *McConnell*'s criticism of the Commission's prior allocation rules for political parties, is it appropriate for the regulations to allow political committees to have non-Federal accounts and to allocate their disbursements between Federal and non-Federal accounts?  If an organization's major purpose is to influence Federal elections, should the organization be required to pay for all of its disbursements out of Federal funds and therefore be prohibited from allocating any of its disbursements?

*Id*. at 11,753.

The FEC presented various proposals, noting that one of them "would add a minimum Federal percentage to the 'funds expended' method, and would also clarify the ratio in the 'funds expended' method by further describing the Federal component of that ratio."  *Id*.  In particular, this proposal "would clarify that 'amounts . . . spent on behalf of federal candidates' includes independent expenditures and amounts spent on public communications that promote, support, attack, support [sic] or oppose a clearly identified Federal candidate."  *Id*. at 11,755.  The proposal also suggested a minimum level of federal funds for allocated spending by non-party political committees, including three alternative minimums.  *Id*. at 11,759-60.  Specifically, the NPRM indicated that the FEC was considering whether nonconnected committees conducting activities "in 10 or more States would face a minimum Federal percentage of 50 percent."  *Id*. at 11,754.

In addition, the NPRM sought comment on a proposed rule establishing "that any funds received in response to solicitations that contained express advocacy for or against a clearly identified Federal candidate" are funds intended "for the purpose of influencing any election for Federal Office," and would therefore be considered "contributions" under FECA.  *See* 69 Fed. Reg. 11,743 (discussing proposed 11 C.F.R. § 100.57).  The NPRM also raised the question of whether the new rule should "use a standard other than express advocacy, such as solicitation

6

that promotes, supports, attacks, or opposes a Federal candidate, or indicates that funds received in response thereto will be used to promote, support, attack, or oppose a clearly identified Federal candidate?" *Id.*

The FEC designated the period from the NPRM until April 9, 2005, for public comments on the proposed rules, and held a hearing on April 14 and 15, 2004. *See* 69 Fed. Reg. 11,736. EMILY's List's representatives did not submit any comments and did not testify at the hearing, although over 100,000 comments were filed by other parties on a variety of issues raised by the rulemaking. A number of commenters offered remarks on the proposed allocation rules and testimony on the proposed revision of the definition of "contributions." *See* Def.'s Opp. to Pl.'s Mot. for P.I. at 9-10, Ex. 10 (Comments of Senators McCain and Feingold), Ex. 12 (Comments of Public Citizen), Ex. 14 (Comments of Republican National Committee), Ex. 15 (Comments of Democracy 21, Campaign Legal Center, Center for Responsible Politics), Ex. 9 (Transcript of April 15, 2004 Hearing) at 207-8.

On August 12, 2004, the General Counsel to the FEC submitted draft final rules to the FEC, which it subsequently amended on August 18, 2004. On August 17, 2004, EMILY's List wrote a letter to the FEC noting that "the new proposed rules . . . provide for substantially different allocation rules for separate segregated funds and non-connected committees," and requested that the FEC publish the draft final rules for new comment. *See* Pl.'s Mot. for PI ("Pl.'s Mot") at 9. However, the FEC did not provide a new comment period.

The FEC published the final rules and an accompanying Explanation and Justification in the Federal Register on November 23, 2004, and the final rules became effective on January 1, 2005. *See* 29 Fed. Reg. 68,056. The new 11 C.F.R. § 100.57(a) states that all money received in

response to a solicitation is a "contribution" under FECA "*if* the communication indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate."  11 C.F.R. § 100.57(a)[4] (emphasis added).

In addition, the new 11 C.F.R. § 106.6 changed the allocation scheme for political or nonconnected committees.  The new regulation replaces the "funds expended" method with a 50 percent federal funds minimum for administrative expenses, voter drives, and public communications that refer to a political party without reference to any specific candidates.  *See* 11 C.F.R. § 106.6(c).  Specifically, 11 C.F.R. § 106.6(c) states that "[n]onconnected committees and separate segregated funds shall pay their administrative expenses, costs of generic voter drives, and costs of public communications that refer to any political party . . . with at least 50

---

[4]This rule in its entirety states:
§ 100.57 Funds received in response to solicitations.
(a) Treatment as contributions. A gift, subscription, loan, advance, or deposit of money or anything of value made by any person in response to any communication is a contribution to the person making the communication if the communication indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate.
(b) Certain allocable solicitations. If the costs of a solicitation described in paragraph (a) of this section are allocable under 11 C.F.R. 106.1, 106.6 or 106.7 (consistent with 11 C.F.R. 300.33(c)(3)) as a direct cost of fundraising, the funds received in response to the solicitation shall be contributions as follows:
(1) If the solicitation does not refer to any clearly identified non-Federal candidates, but does refer to a political party, in addition to the clearly identified Federal candidate described in paragraph (a) of this section, one hundred percent (100%) of the total funds received are contributions.
(2) If the solicitation refers to one or more clearly identified non-Federal candidates, in addition to the clearly identified Federal candidate described in paragraph (a) of this section, at least fifty percent (50%) of the total funds received are contributions, whether or not the solicitation refers to a political party.
(c) Joint fundraisers. Joint fundraising conducted under 11 C.F.R. 102.17 shall comply with the requirements of paragraphs (a) and (b) of this section except that joint fundraising between or among authorized committees of Federal candidates and campaign organizations of non-Federal candidates is not subject to paragraph (a) or (b) of this section.

percent Federal funds . . . ." 11 C.F.R. § 106.6(c).[5]

The new section 106.6(f)[6] also provides that public communications and voter drives that refer to one or more clearly identified federal candidates but to no nonfederal candidates, must be financed with 100 percent federal funds, regardless of whether political parties are also

---

[5]11 C.F.R. § 106.6(c) in its entirety states:
Method for allocating administrative expenses, costs of generic voter drives, and certain public communications. Nonconnected committees and separate segregated funds shall pay their administrative expenses, costs of generic voter drives, and costs of public communications that refer to any political party, as described in paragraphs (b)(1)(i), (b)(1)(iii) or (b)(1)(iv) of this section, with at least 50 percent Federal funds, as defined in 11 C.F.R 300.2(g).

[6]11 C.F.R. § 106.6(f) in its entirety states:
Payments for public communications and voter drives that refer to one or more clearly identified Federal or non-Federal candidates. Nonconnected committees and separate segregated funds shall pay for the costs of all public communications that refer to one or more clearly identified candidates, and voter drives that refer to one or more clearly identified candidates, as described in paragraphs (b)(2)(i) and (b)(2)(ii) of this section, as follows:
(1) The following shall be paid 100 percent from the Federal account of the nonconnected committee or separate segregated fund:
(i) Public communications that refer to one or more clearly identified Federal candidates, regardless of whether there is reference to a political party, but do not refer to any clearly identified non-Federal candidates, as described in paragraph (b)(2)(iii) of this section; and
(ii) Voter drives described in paragraph (b)(2)(i) of this section.
(2) The following may be paid 100 percent from the non-Federal account of the nonconnected committee or separate segregated fund:
(i) Public communications that refer to a political party and one or more clearly identified non-Federal candidates, but do not refer to any clearly identified Federal candidates, as described in paragraph (b)(2)(iv) of this section; and
(ii) Voter drives described in paragraph (b)(2)(ii) of this section.
(3) Notwithstanding 11 C.F.R. 106.6(a)(i), public communications and voter drives that refer to one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates, regardless of whether there is a reference to a political party, including those that are expenditures, independent expenditures or in-kind contributions, shall be allocated as follows:
(i) Public communications and voter drives, other than phone banks, shall be allocated based on the proportion of space or time devoted to each clearly identified Federal candidate as compared to the total space or time devoted to all clearly identified candidates, or
(ii) Public communications and voter drives that are conducted through phone banks shall be allocated based on the number of questions or statements devoted to each clearly identified Federal candidate as compared to the total number of questions or statements devoted to all clearly identified candidates.

mentioned.  *See* 11 C.F.R. § 106.6(f)(1).  In the case of public communications and voter drives

that refer to a political party and only nonfederal candidates may be financed with 100 percent

nonfederal funds.  11 C.F.R. § 106.6(f)(2).  In the case of "communications and voter drives that

refer to one or more clearly identified Federal candidates and one or more clearly identified non-

Federal candidates," the FEC dictated that expenses "shall be allocated based on the proportion

of space or time devoted to each clearly identified Federal candidate as compared to the total

space or time devoted to all clearly identified candidates."  11 C.F.R. § 106.6(f)(3)(i).

### B.      *Procedural Background*

After the challenged regulations went into effect on January 1, 2005, Plaintiff EMILY's

List filed its Complaint and Motion for Preliminary Injunction on January 12, 2005.  Plaintiff's

Complaint raises four claims.  In Count I, Plaintiff claims that the FEC exceeded its statutory

authority when it promulgated the allocation and solicitation regulations, in violation of the

Administrative Procedure Act ("APA"), which prohibits federal agencies from promulgating

regulations "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right."  Compl. ¶¶ 46-53; 5 U.S.C. § 706(2)(C).  Plaintiff's Count II asserts that the FEC failed to

provide adequate notice of the final regulations, in violation of section 553(b) of the APA.

Compl. ¶¶ 54-63.  In Count III, Plaintiff alleges that the new regulations are arbitrary, capricious,

and an abuse of discretion, in violation of section 706(2)(A) of the APA.  Compl. ¶¶ 64-71.

Finally, in Count IV Plaintiff alleges that the FEC has violated its First Amendment rights as

guaranteed by the Constitution of the United States.  Compl. ¶¶ 72-79.

Plaintiff has filed the instant Motion for Preliminary Injunction, accompanied by a

Statement of Facts Which Make Expedition Essential, seeking a preliminary injunction

preventing the FEC from enforcing the newly promulgated allocation and solicitation regulations.

## II.    LEGAL STANDARD

In assessing whether to grant preliminary injunctive relief, which is considered an extraordinary remedy in this circuit, *see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969); *Mylan Pharm. Inc. v. Henney*, 94 F.Supp.2d 36, 58 (D.D.C. 2000), a court must balance four factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another.  *See CityFed Fin.*, 58 F.3d at 747.  Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."  *Id.*  Notwithstanding the fluid nature of this familiar four-part inquiry, "it is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits."  *Barton v. Dist. of Columbia*, 131 F.Supp.2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)).  If the movant fails to do so, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor."  *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

Furthermore, a party seeking preliminary injunctive relief must demonstrate at least some

irreparable injury because "the basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (alterations omitted).  Thus, if the movant makes no showing of irreparable injury, "that alone is sufficient" for a district court to refuse to grant preliminary injunctive relief.  *Id.*; *see also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("We believe that analysis of [irreparable harm] disposes of these motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").

In this Circuit, injury is irreparable only if it is "both certain and great."  *Wisconsin Gas*, 758 F.2d at 674.  This two-part definition requires first that the alleged harm "be actual and not theoretical" and "'of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'"  *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir.1976)) (emphasis in original).  Second, financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business.  *See Wisconsin Gas*, 758 F.2d at 674 (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir.1977)).  As the United States Court of Appeals for the District of Columbia Circuit has explained,

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Wisconsin Gas*, 758 F.2d at 674 (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (1958)).

Furthermore, "[t]he purpose of a preliminary injunction is merely to preserve the relative

positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (2001). If the requested relief "would alter, not preserve, the *status quo* . . . [a plaintiff] must meet a higher standard than were the injunction . . . sought merely prohibitory." *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001) (citing *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir 1997); *Dorfmann*, 414 F.2d at 1173).

## III. DISCUSSION

After an examination of the filings in this case, the Court finds that all four of the considerations relevant to the Court's determination on whether to grant or deny a preliminary injunction weigh in favor of denial of Plaintiff's request. The Court finds that Plaintiff is not substantially likely to succeed on the merits, that Plaintiff has failed to demonstrate that irreparable injury will result from the Court's denial of injunctive relief, and that the impact of an injunction would cause harm to the interrelated interests of both the FEC and the public.

### A. *Plaintiff has not Shown a Substantial Likelihood of Success on the Merits*

Although a preliminary injunction is not an opportunity to make a final determination on the merits of Plaintiff's claims, the Court finds that Plaintiff has not demonstrated that there is a substantial likelihood that it will succeed on the merits in this suit. Plaintiff makes several principal challenges to the proposed regulations. Plaintiff argues that the FEC failed to provide adequate notice of the final solicitation and allocation regulations. Plaintiff also claims that the FEC overstepped its statutory authority in promulgating these regulations, and that the regulations themselves are arbitrary and capricious. Finally, Plaintiff claims that the regulations violate Plaintiff's rights under the First Amendment of the Constitution.

At the outset, the Court notes that the preliminary injunction stage is not the appropriate

time to consider the merits of Plaintiff's substantive APA claims.  "[W]hen a party seeks review

of agency action under the APA, the district judge sits as an appellate tribunal.  The 'entire case'

on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C.

Cir. 2001).  Although a motion for preliminary injunction against an agency is not always

inappropriate, the better course is to rule on the merits of the substantive issues at a later date,

particularly where allegations of irreparable injury are lacking at this stage.  *See id*. at 1083-84 &

nn.7-8.

Although EMILY's List claims that the FEC failed to provide adequate notice of the rules

it eventually promulgated, the Court finds that this argument is unlikely to carry the day.

Plaintiff claims that the FEC violated the APA's notice and comment requirements because "the

overall content and structure of the final rules depart substantially from that proposed in March,"

and that although Plaintiff requested an additional opportunity to comment on the final proposed

rules, no such opportunity was provided.[7]  Pl.'s Mot. at 20.  The Court's examination of the

rulemaking process, including both the NPRM and the final rules, reveals that the FEC provided

Plaintiff and the public in general with legally sufficient notice.

Pursuant to section 553 of the Administrative Procedure Act, there are three basic

requirements for agency rulemaking: first, the public must be given notice of the proposed

rulemaking; second, the public must be given an opportunity to comment on the proposed rule,

either orally or in writing; and third, the agency must include with the final rule a statement of

the rule's basis and purpose.  Specifically, the Act requires that "[g]eneral notice of proposed rule

---

[7]The Court notes that nowhere in the 11 pages of its Motion devoted to a discussion of
allegedly inadequate notice does Plaintiff cite to any actual provision of the APA that sets forth
the statute's notice and comment provisions.

making shall be published in the Federal Register," and that "[t]he notice shall include . . . either

the terms or substance of the proposed rule or a description of the subjects and issues involved."

5 U.S.C. § 553(b).  After such notice has been provided, "the agency shall give interested persons

an opportunity to participate in the rule making through submission of written data, views, or

arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).  When the final

rules are promulgated, the agency is obligated to "incorporate in the rules adopted a concise

general statement of their basis and purpose."  *Id.*

     The Court notes that section 553 itself does not require the agency to publish the text of a

proposed rule, since the agency is permitted to publish "*either* the terms or substance of the

proposed rule *or* a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3)

(emphasis added).  This Circuit has held that "[t]he law does not require that every alteration in a

proposed rule be reissued for notice and comment," because "[i]f that were the case, an agency

could 'learn from the comments on its proposals only at the peril of' subjecting itself to

rulemaking without end."  *First Am. Disc. Corp. v. Commodity Futures Trading Comm'n*, 222

F.3d 1008, 1015 (D.C. Cir. 2000) (quoting *Int'l Harvester Co. v. Ruckleshaus*, 478 F.2d 615, 632

& n.51 (D.C. Cir. 1973)).  "Instead, renewed notice is required only if the final rule cannot fairly

be viewed as a 'logical outgrowth' of the initial proposal."  *First Am. Disc. Corp.*, 222 F.3d at

1015 (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir.

1983)).  An agency has satisfied this "logical outgrowth" test "if interested parties should have

anticipated that the change was possible, and thus reasonably should have filed their comments

on the subject during the notice-and-comment period."  *Northeast Md. Waste Disposal Auth. v.

EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004) (citation omitted).  Stated a different way, the

requirement is satisfied if the notice is "sufficient to apprise the public, at a minimum, that the

issue . . . was on the table." *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1276 (D.C. Cir. 1996)

It is abundantly clear that Plaintiff had sufficient notice of the proposed revisions to the

FEC's allocation regulations.  With respect to 11 C.F.R. § 106.6(c), a number of statements in

the NRPR should have alerted EMILY's List to the fact that the FEC might implement a fixed 50

percent federal funds minimum requirement.  In the NPRM, under the heading "Minimum

Federal percentage," the FEC wrote that "[t]he proposal would add a minimum Federal

percentage to the 'funds expended' allocation method," and that "[t]he Commission is

considering other minimum Federal percentages as alternatives to those presented in the

proposed rules."  69 Fed. Reg. 11,754.  The NPRM specifically asked "[s]hould the Commission

adopt a fixed minimum Federal percentage," and proposed that nonconnected committees that

conduct activities "in 10 or more States would face a minimum Federal percentage of 50

percent." *Id.*  In light of the language included in the NPRM, it is simply implausible that

EMILY's List was not on notice that a fixed 50 percent federal funds minimum requirement

might be incorporated into the final rules.[8]

The Court finds the same result with respect to notice of the creation of 11 C.F.R. §

106.6(f), which modified the allocation rules for communications that refer to either federal or

nonfederal condidates.  The development of this new section was referenced in the NPRM.  *See*

---

[8]The FEC notes that the president of EMILY's List, Ellen Malcolm, is also the president
of America Coming Together, another committee that in fact submitted comments on this issue
through the same counsel. *See* Def.'s Opp. at 33 n.26.  The FEC argues that this commonality
amounts to actual notice on the part of EMILY's List of the final rule. *Id*.  Although this gossipy
tidbit may in fact offer a window onto the behind-the-scenes machinations of political strategists,
the Court confines its analysis to the legal principles at issue.

69 Fed. Reg. 11,755.  Plaintiff argues that the FEC provided no notice that it might use the

language "refer to" rather than the narrower language "promote, support, attack, or oppose a

clearly identified Federal candidate."  *See* Pl.'s Mot. at 26-27.  Although the "refer to" language

was not included in the NPRM, interested parties were on notice that the FEC was considering

creating this entirely new subsection of 11 C.F.R. § 106.6, and that those parties would have been

reasonably notified that they should offer commentary on all the various facets of such a new

provision.  Although the NPRM could have specifically stated that this feature of the proposed

provision was specifically open to change, "renewed notice is required only if the final rule

cannot fairly be viewed as a 'logical outgrowth' of the initial proposal."  *First Am. Disc. Corp.*,

222 F.3d at 1015 (quoting *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 547).  The

Court declines to find at this stage that "refer to" cannot be considered a "logical outgrowth" of

the "promote, support, attack, or oppose" language included in the NPRM.

    Finally, the Court also finds that Plaintiff had legally sufficient notice of the solicitation

regulation, 11 C.F.R. § 100.57, which states that funds received in response to a communication

are considered a "contribution . . . if the communication indicates that any portion of the funds

received will be used to support or oppose the election of a clearly identified Federal candidate."

11 C.F.R. § 100.57(a).  The NPRM indicated that "[p]roposed section 100.57 would state that

any funds provided in response to a solicitation that contained express advocacy for or against a

clearly identified Federal candidate are contributions"  69 Fed. Reg. 11,743.  Plaintiff argues that

the public was not on notice that the FEC might employ the "indicates" standard, instead of the

"express advocacy" standard.  *See* Pl.'s Mot. at 30-31.  Plaintiff's argument is wholly unavailing,

however, since the NPRM specifically asked whether "the new rule [should] use a standard other

17

than express advocacy, such as solicitation that . . . *indicates* that funds received in response thereto will be used to promote, *support*, attack, or *oppose* a clearly identified Federal candidate." 69 Fed. Reg. 11,743 (emphasis added).  The NPRM included the specific language ultimately adopted, and this Circuit has adhered to the principle that the fact that a NPRM describes one alternative "approvingly does not undermine the notice to interested parties that the rule was subject to modification . . . ."  *Career Coll. Ass'n*, 74 F.3d at 1276.  Accordingly, and in light of the language included in the NPRM, the Court finds that Plaintiff has not demonstrated the requisite substantial likelihood of success on the merits as to its argument that the FEC failed to provide adequate notice of the rules it ultimately promulgated.      Substantively, the Court finds that Plaintiff has not demonstrated any right, statutory or otherwise, to the former system of allocation rules.  In reaching this conclusion, the Court relies on the reasoning in *Common Cause v. Federal Election Commision*, 692 F. Supp. 1391 (D.D.C. 1987).  In *Common Cause*, Judge Thomas A. Flannery found that the FEC had the authority to determine what method of allocation to use, if any.[9]  *Id*. at 1396.  Judge Flannery found that "[i]ndeed, it is possible that the Commission may conclude that *no* method of allocation will effectuate the Congressional goal that *all* monies spent by state political committees on those activities permitted in the 1979 amendments be 'hard money' under the FECA."  *Id*. (emphasis in original).  Although Plaintiff disputes Defendant's use of the term "administrative grace" to characterize its decision about whether to use an allocation formula, *see* Pl.'s Reply at 1, the fact remains that Plaintiff is not

---

[9]The Court notes that the decision in *Common Cause* addresses the applicability of allocation regulations to party committees, s*ee generally Common Cause*, 692 F. Supp. 1391, rather than nonparty political committees such as EMILY's List.  However, Judge Flannery's reasoning with respect to the FEC's authority to regulate allocation methods is equally applicable in the instant context.

entitled to the previous arrangement simply because Plaintiff prefers it.

Judge Flannery's view in *Common Cause* is borne out by an examination of FECA itself, in which there is no specified allocation system for political committees such as EMILY's List.[10] In *McConnell*, the Supreme Court noted that, "although a literal reading of FECA's definition of 'contribution' would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities--including get-out-the-vote drives and generic party advertising--in part with soft money." *McConnell*, 540 U.S. at 123. Indeed, the Supreme Court in *McConnell* indicated that the "FEC's allocation regime" in fact "subverted" the purposes of FECA because it allowed such committees "to use vast amounts of soft money in their efforts to elect federal candidates." *Id*. at 124. It is clear then, that the FEC's decision to allow any given allocation formula by a political committee such as EMILY's List, with respect to its expenditures intended to influence both federal and nonfederal elections, is within the Commission's purview.

In light of this, the Court considers whether Plaintiff's First Amendment concerns would in fact militate for a resolution in Plaintiff's favor, and determines that such a result is unlikely. The Supreme Court has made it clear from *Buckley v. Valeo*, 424 U.S. 1 (1976), onward, that the government has an important interest in preventing corruption and the appearance of corruption in the electoral process, and has upheld the FEC's measures taken to prevent circumvention of contribution restrictions aimed at protecting this interest. *See id.* at 26-28, 46-47; *Fed. Election*

---

[10]Indeed, FECA does not address allocation, except in a recently enacted provision of BCRA that permits state party committees to spend a specific type of funds, known as "Levin" funds on an allocated basis for certain voter drive activities. *See* 2 U.S.C. § 441i(b)(2). This provision is not relevant to the instant suit.

*Comm'n  v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 498 (1985); *McConnell*, 540 U.S. at 143-45; *see also* Pl.'s Mot. at 35 ("The First Amendment to the United States Constitution prohibits the government from restricting the types and amounts of funds used to create political speech or otherwise influence federal elections unless the restrictions are meant to prevent the actual or apparent corruption of elected officials.").  It is similarly clear that the FEC undertook the challenged rulemaking process in light of the Supreme Court's *McConnell* decision, in an effort to avoid circumvention of contribution and expenditure limits.  *See* 69 Fed. Reg. 11,736-37 (setting forth the Supreme Court's *McConnell* decision as the backdrop to the challenged rulemaking process).  The FEC specifically stated in its Explanation and Justification for the final rule 11 C.F.R. § 106.6(c) allocation provision that nonconnected or political committees:

> have registered as Federal political committees with the FEC; consistent with that status, political committees should not be permitted to pay for administrative expenses, generic voter drives and public communications that refer to a political party with a greater amount of non-Federal funds than Federal funds.

69 Fed. Reg. 68,062.

Plaintiff argues that the FEC's challenged regulations violate the First Amendment because they "go far beyond the government intrusions approved in *Buckley* and its progeny." Pl.'s Mot. at 35.  Plaintiff argues that, "even if the regulations could be connected to corruption or the appearance of corruption," the FEC has failed to produce specific evidence of such a link. *Id*. at 36.  However, the Court finds that Plaintiff is unlikely to succeed with this approach.  With respect to the new allocation regulations, 11 C.F.R. § 106.6(c) and 11 C.F.R. § 106.6(f), it is apparent that the FEC promulgated these rules in an effort to close an oft-exploited loophole in federal election law.  Under the reasoning of both *Common Cause* and the Supreme Court's

decision in *McConnell*, it is clear to the Court that the FEC is empowered under FECA to modify allocation rules to ensure that unregulated monies are not used to improperly influence federal elections.  Indeed, the Court finds persuasive Defendant's argument that the FEC's "entire allocation system implements the contribution restrictions that have been held to serve an anti-corruption purpose."  Def.'s Opp. at 22; *see also id*. at 16-17 (citing to Methods of Allocation Between Federal and Non-Federal Accounts, 55 Fed. Reg. 26,058 (1990) and Allocation of Federal and Non-Federal Expenses, 57 Fed. Reg. 8,990 (1992), each of which states that allocation rules "implement the contribution and expenditure limitations and prohibitions established by . . . provisions of the [FECA] . . . .").

The Court similarly finds that the same can be said of the solicitation regulation, 11 C.R.F. § 100.57, challenged by Plaintiff.  Section 100.57 considers that funds given "in response to any communication [constitute] a contribution to the person making the contribution if the communication indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate."  11 C.F.R. § 100.57.  Again under the rationale of *McConnell*, this regulation appears on its face to be reasonably designed to prevent corruption or the appearance of corruption, and like the allocation regulations, the solicitation regulation appears to be designed to enforce the contribution restrictions embodied in FECA.  Indeed, as Defendant points out, *see* Def.'s Opp. at 31, the FEC specifically stated in its notice of final rules that "[t]his addition [to the definition of 'contribution'] comports with the statutory standard for 'contribution' by reaching payments 'made . . . for the purpose of influencing any election for Federal office.'"  69 Fed. Reg. 68,056.

**B.     *Plaintiff has not Demonstrated Irreparable Harm***

Next the Court considers whether Plaintiff has demonstrated that it will suffer irreparable injury if the Court declines to issue preliminary injunctive relief. In order for Plaintiff to be entitled to injunctive relief, it must demonstrate at least some irreparable harm because "the basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson*, 415 U.S. at 88). In the absence of such a showing, a district court is justified in refusing to grant the requested relief. *Id.* In order to merit the granting of a preliminary injunction, the alleged harm "be actual and not theoretical" and "'of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Ashland Oil, Inc.*, 409 F. Supp. at 307). Furthermore, financial harm without more cannot constitute irreparable injury unless it threatens the very existence of the movant's business. *See Wisconsin Gas*, 758 F.2d at 674 (citing *Washington Metro. Area Transit Comm'n*, 559 F.2d at 843 n.2).

The Court notes that Plaintiff devotes a mere one page of its Motion to this central question of irreparable harm, apparently relying on the persuasive power of invoking the First Amendment. *See* Pl.'s Mot. at 36-37. The essence of Plaintiff's claim is that the challenged regulations modify the scheme under which Plaintiff can raise and spend funds, which thereby impacts its ability to undertake its political activities. *See id.* However, the Court finds that Plaintiff has failed to make the requisite showing of imminent, irreparable injury. Although it is true that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), "[a] litigant must do more than merely *allege* the violation of First Amendment rights . . . ." *Wagner v. Taylor*, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987).

22

Defendant points out that the new 50 percent federal funds minimum requirement does not require Plaintiff to alter its present practices, because Plaintiff has been using this allocation formula for a number of years.  Def.'s Opp. at 40.  Defendant states that "[o]ver the past ten years, EMILY's List has <u>never</u> filed a final H1 Schedule reporting less than 50% direct federal candidate support," Def.'s Opp. at 3 (emphasis in original), and Defendant provides supporting documentation, *see* Def.'s Opp. Ex. 6 (End of Year Disclosure Reports filed by EMILY's List with FEC).  Plaintiff does not contradict this statement.  Consequently, the Court finds it difficult to agree that Plaintiff can be injured by a regulation that requires no change from Plaintiff's current practices.  *See, e.g.*, *Socieded Anonima Vina Santa Rita v. U.S. Dep't of the Treasury*, 193 F. Supp. 2d 6, 27 (D.D.C. 2001) (finding no irreparable harm where plaintiff's practices would not be changed by new government regulation).

Furthermore, the new rules do not in fact prevent Plaintiff from engaging in whatever political speech it seeks to undertake.  While under the new allocation rule, committees such as EMILY's List are required to fund certain types of communications using at least 50 percent federal funds, this does not limit their right to undertake their desired political expression.  In considering contribution limits in *Buckley*, the Supreme Court held that "the overall effect of [FECA] contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons."  *Buckley*, 424 U.S. at 21-22.  Indeed, the same rationale is applicable to Plaintiff's present situation; Plaintiff is free to undertake the same political speech as before, but may be required to raise money from a greater number of donors.

Finally, it appears that if the Court declines to issue a preliminary injunction and Plaintiff later prevails on the merits of this suit, Plaintiff would be in a position to seek a retroactive

adjustment of its expenditure ratios.  In light of these various realities, the Court finds that

Plaintiff has not demonstrated the requisite imminent, irreparable injury that would merit the

granting of a preliminary injunction.

> **C.      *The Balance of Harms and Interests Favors Denial of the Preliminary***
>
> ***Injunction***

In contrast to Plaintiff's weak showing on the irreparable harm prong of the test for the

propriety of a preliminary injunction, the Court finds that the third and fourth factors weigh

heavily against the issuance of an injunction.  Inquiring into the impact of an injunction on

Defendant and the public interest, *see Mova Pharm. Corp.*, 140 F.3d at 1066, it is clear that

issuing a preliminary injunction at this stage would throw the present system of regulations into

disarray.  As it stands, the FEC has implemented a set of bright line rules, which although

Plaintiff may disagree with the policy decision, provide clearly delineated parameters for

organizations undertaking the type of political activity engaged in by EMILY's List.

The Supreme Court has made it clear that the government must take care to prevent "both

the actual corruption threatened by large financial contributions and the eroding of public

confidence in the electoral process through the appearance of corruption."  *McConnell*, 540 U.S.

at 136 (citation omitted).  Enjoining the disputed rules would undermine the FEC's efforts

towards this end because in place of the regulations the public would find these portions of

campaign finance law suddenly unregulated.  *Cf. Shays v. Fed. Election Comm'n*, 337 F. Supp.

2d 28, 129-30 (D.D.C. 2004) (declining to enjoin regulations after finding them invalid and

remanding them to the FEC).  Enjoining the new rules would not even automatically reinstate the

arguably flawed former regime preferred by Plaintiff, *see* Def.'s Opp. at 43; rather it would leave

the FEC in the position of either allowing these areas to go unregulated until final resolution of this case, or hastily cobbling together an alternative, interim set of regulations.  The Court finds that any of these scenarios is potentially harmful to the public interest such that it renders the issuance of preliminary injunctive relief inappropriate.

**IV.      CONCLUSION**

After a careful examination of Plaintiff's Motion for Preliminary Injunction, the parties' briefs and exhibits, as well as the relevant law, the Court finds that Plaintiff has not demonstrated that the issuance of a preliminary injunction would be appropriate at this time.  Plaintiff has not demonstrated a substantial likelihood of success on the merits of its case, nor has Plaintiff demonstrated that it will suffer irreparable harm in the absence of an injunction.  In contrast, the Court finds that the interests of both Defendant and the public would be disserved by the granting Plaintiff's Motion.

Accordingly, Plaintiff's Motion for Preliminary Injunction shall be denied.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge