# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMILY's LIST,<br><br>    Plaintiff,<br><br>        v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>    Defendant. | Civil Action No. 05–0049 (CKK) |

## MEMORANDUM OPINION
(July 31, 2008)

Currently pending before the Court are cross-motions for summary judgment filed by

Plaintiff, EMILY's List, an organization that recruits and funds pro-choice women candidates for

political office, and Defendant, the Federal Election Commission ("FEC" or "Commission").

EMILY's List, a political committee registered with the FEC, commenced this action by filing a

Complaint and Motion for Preliminary Injunction in January 2005, asserting a facial challenge to

regulations promulgated by the Commission to implement the provisions of the Federal Election

Campaign Act of 1971, Pub.L. No. 92-255, 86 Stat. 3, ("FECA"), as amended by the Bipartisan

Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ("BCRA").  The challenged

regulations established a new rule for when funds received by political committees in response to

certain solicitations must be treated as "contributions" under FECA and modified the

Commission's rules governing how political committees may allocate spending between federal

and nonfederal accounts.[1]  EMILY's List sought to enjoin the enforcement of the regulations,

which went into effect in January 2005, alleging that each was in excess of the Commission's

authority, was arbitrary and capricious, was promulgated without adequate notice under the

Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2), and violated the First Amendment to

the United States Constitution.  On February 25, 2005, the Court issued a Memorandum Opinion

and Order denying EMILY's List's motion for preliminary injunction, which was subsequently

affirmed on appeal.  *See EMILY's List v. FEC*, 362 F. Supp. 2d 43 (D.D.C. 2005) (hereinafter

"*PI Mem. Op.*"), *aff'd* 170 Fed. App'x. 719 (Dec. 22, 2005).

The parties then proceeded to brief cross-motions for summary judgment; however, in

June 2007, the United States Supreme Court issued its opinion in *FEC v. Wisconsin Right to Life*,

127 S. Ct. 2652 (2007) ("*WRTL*"),[2] which significantly impacted a number of the arguments

raised by the parties in their then-pending cross-motions for summary judgment.  Accordingly,

the Court denied the parties' initial cross-motions for summary judgment without prejudice and

ordered the parties to file revised briefing that accurately reflected the state of the law.  *See*

7/12/07 Order, Docket No. [29].  Those revised cross-motions for summary judgment are now

---

[1] "Federal" funds–also referred to as "hard money"–are funds that are subject to FECA's disclosure requirements and source and amount limitations.  *McConnell v. FEC*, 540 U.S. 93, 122 (2003).  In contrast, "nonfederal" funds, or "soft money," are funds raised outside of the source and amount limitations imposed by FECA, which political parties may solicit and accept for purposes not related to federal elections, provided that they are placed in accounts separate from federal funds.  *See McConnell v. FEC*, 251 F. Supp. 2d 176, 196-97 & n.9 (D.D.C. 2003) (per curiam).

[2] The Supreme Court did not issue a majority opinion in *WRTL*.  "[T]he holding of the Court" in the case is therefore the "position taken by those Members who concurred in the judgments on the narrowest grounds," which is the opinion by Chief Justice Roberts (joined by Justice Alito).  *Marks v. United States*, 430 U.S. 188, 192-93 (1977).

ripe, and the Court has conducted a searching review of the parties' briefs, the exhibits attached

thereto, the brief filed by *amici curiae* Senators John McCain and Russell Feingold,

Representative Christopher Shays, Democracy 21, and the Campaign Legal Center in opposition

to Plaintiff's revised motion for summary judgment, the relevant statutes and case law, and the

entire record herein.  Based on the foregoing, the Court shall DENY [32] EMILY's List's Motion

for Summary Judgment and shall GRANT [34] the Commission's Cross-Motion for Summary

Judgment.

## I.  BACKGROUND

The events, statutes, and case law relevant to this opinion are largely addressed in the

Court's February 25, 2005 Memorandum Opinion denying EMILY's List's motion for

preliminary injunction.  *PI Mem. Op.*, 362 F. Supp. 2d 43.  Accordingly, the Court assumes

familiarity with that opinion, and only recites herein those facts that are relevant to resolving the

instant cross-motions for summary judgment.[3]

### A.    Parties

The Federal Election Commission is the independent agency of the United States

government with exclusive jurisdiction to administer, interpret, and civilly enforce FECA.  2

---

[3] This Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h)).  As such, in resolving the instant cross-motions for summary judgment, the Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1; 7(h).  Specifically, the Court looks to each party's statement to cull out the relevant undisputed facts and to determine those facts that are conceded by the cross-moving party.  Further, as discussed below, while the Commission challenges the sufficiency of the evidence supporting some of EMILY's List's factual assertions, the parties' factual disputes are not ultimately material because the Court's conclusions in this opinion turn on legal conclusions, as opposed to factual findings.

U.S.C. §§ 437c(b)(1), 437d(a), and 437g; FEC Stmt. of Mat'l Facts ¶ 1; Pl.'s Stmt. of Genuine

Issues and Objs. (hereinafter "Pl.'s Resp. Stmt.") ¶ 1.  Among other things, the Commission is

empowered to "formulate policy with respect to" FECA, *see* 2 U.S.C. § 437c(b)(1), and to

promulgate "such rules . . . as are necessary to carry out the provisions" of FECA, *id.* §

437d(a)(8).  FEC Stmt. ¶ 2; Pl.'s Resp. Stmt. ¶ 2.

   EMILY's List has been registered with the Commission as a multicandidate

nonconnected political committee for more than 20 years.  FEC Stmt. ¶ 3; Pl.'s Resp. Stmt. ¶ 3.[4]

EMILY's List has separate bank accounts to fund its federal and nonfederal activities.  FEC

Stmt. ¶ 4; Pl.'s Resp. Stmt. ¶ 4.  The parties do not dispute that EMILY's List's nonfederal

account accepts funds from sources and in amounts that various states authorize for use in

supporting state and local candidates, but that may not permissibly be used to support federal

candidates under federal campaign finance laws.  Pl.'s Stmt. of Mat'l Facts ¶ 26; FEC Stmt. of

Genuine Issues and Objs. (hereinafter "FEC Resp. Stmt.") ¶ 26.  EMILY's List describes itself as

"a political organization whose purpose is to recruit and fund viable women candidates for local,

state and federal office; to help them build and run effective campaign organizations; and to

mobilize women voters to help elect progressive candidates."  Pl.'s Stmt. ¶ 20.[5]  The Court

---

[4] Pursuant to 11 C.F.R. § 106.6(a), a "nonconnected committee' includes any [political] committee which conducts activities in connection with an election, but which is not a party committee, an authorized committee of any candidate for federal election, or a separate segregated fund."  11 C.F.R. § 106.6(a).  In turn, as defined in FECA, a "political committee" is "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year . . . ."  2 U.S.C. § 431(4)(A).

[5] In response to EMILY's List's description of itself and its programs in its Statement of Material Facts, *see* Pl.'s Stmt. ¶¶ 20-24, the Commission correctly notes that the relevant paragraphs "rely on the Declaration of Britt Cocanour, [EMILY's List's Assistant Treasurer and

discusses EMILY's List's activities in greater detail below, after addressing the relevant

regulatory framework.

### B.      *Regulatory Framework*

The overarching purpose of FECA was to place limitations on contributions and

expenditures in connection with federal elections.  *See McConnell*, 251 F. Supp. 2d at 193 (per

curiam).  FECA's passage, however, "did not deter unseemly fundraising and campaign

practices," *McConnell*, 540 U.S. at 118, and in particular, "the invention and proliferation of

political committees that purported to be independent and outside the knowledge and control of

the candidates and designated campaign committees . . . eviscerated statutory limitations on

contributions and expenditures," *Buckley v. Valeo*, 519 F.2d 821, 837 (D.C. Cir. 1975), *aff'd in*

*part, rev'd in part*, 424 U.S. 1 (1976)).  In 1974, Congress passed comprehensive amendments to

FECA, which, *inter alia*, established the FEC, *McConnell*, 540 U.S. at 118, and in 2002,

Congress enacted BCRA, which represented the "first major overhaul of [FECA] since the 1974

Amendments and their revision following [the Supreme Court's opinion in *Buckley v. Valeo*, 424

U.S. 1 (1976)]." *McConnell*, 251 F. Supp. 2d at 205 (per curiam).  BCRA was intended to stem

the tide of nonfederal funds being improperly used to influence federal elections.  *PI Mem. Op.*,

362 F. Supp. 2d at 46.  Although pre-BCRA campaign finance laws were intended to prevent soft

---

Chief of Staff,] filed on September 14, 2007, as their lone source of evidentiary support," FEC
Resp. Stmt. ¶¶ 20-24.  The Commission continues to state that it "objects to these facts and the
Cocanour Declaration as conclusory, speculative, and without foundation" because, according to
the Commission, Paragraphs 20-24 of EMILY's List's Statement of Material Facts, "reproduced
verbatim from the [Cocanour] declaration, contain conclusions that the declarant does not state
are based upon her personal knowledge."  *Id.*  Insofar as EMILY's List asserts facts regarding the
organization's purpose and activities, the Court finds that Ms. Cocanour's declaration provides
sufficient factual support because, as the organization's Assistant Treasurer and Chief of Staff,
she is in a position of knowledge with respect to those issues.

money from being used to influence federal elections, by the time of BCRA's passage, the circumvention of these laws had become routine, resulting in unregulated funds being used to influence federal elections.  *Id.*

The FEC rules in effect until June 2005 permitted non-party committees (including EMILY's List) to allocate spending for administrative expenses and generic voter drive activity (as opposed to candidate-specific disbursements) pursuant to the so-called "funds expended method."  11 C.F.R. § 106.6(c) (2002).  Under that approach, "expenses [were to] be allocated based on the ratio of federal expenditures to total federal and non-federal disbursements made by the committee during the two-year federal election cycle. . . .  In calculating its federal expenditures, the committee [was to] include only amounts contributed to or otherwise spent on behalf of specific federal candidates."  *Id.* § 106.6(c)(1) (2002).

Prior to the enactment of BCRA, party committees were also required to allocate their expenses for "mixed" federal and nonfederal expenses, but did so according to fixed percentages rather than the "funds expended" methods.  *See id.* § 106.5(b)(2)(i), (ii) (2002); § 106.5(d)(1)(i) (2002).  While functioning under these allocation rules, party committees routinely circumvented the spirit of campaign finance laws by using soft money to finance activities intended to influence federal elections.  *McConnell*, 540 U.S. at 131-32; *PI Mem. Op.*, 362 F. Supp. 2d at 47.  Congress ultimately determined that the existing allocation system was not effective at limiting party committees' spending of nonfederal funds to nonfederal activities.  *McConnell*, 540 U.S. at 131-34.  Instead, Congress determined that the allocation system in fact enabled the circumvention of the law by authorizing the spending of soft money on activities that were intended to, and in fact did, influence federal campaigns.  *See McConnell*, 251 F. Supp. 2d at 651 (Kollar-Kotelly, J.)

(noting that FEC regulations permitted widespread use of nonfederal money by party units to influence federal elections).  In BCRA, Congress sought to modify the flawed regime by banning national party committees from raising or spending any nonfederal funds.  *See* 2 U.S.C. § 441i(a). State party committees were permitted to raise nonfederal funds for nonfederal races, but were precluded from spending nonfederal funds on advertisements that "promote, support, attack or oppose" federal candidates.  *Id.* §§ 431(20)(A)(iii); 441i(b)(1).  BCRA also permitted state parties to fund certain "federal election activities," including voter mobilization activities, with an allocated mixture of federal funds and limited, regulated nonfederal funds.  *Id.* §§ 431(20)(A); 441i(b)(2).  BCRA was challenged, and ultimately upheld by the Supreme Court.  *See generally McConnell*, 540 U.S. 93.

Although the Supreme Court's decision in *McConnell* only addressed allocation with respect to party committees, in 2004, the FEC undertook a rulemaking aimed at curbing the similar use of nonfederal funds in connection with federal campaign activity by nonconnected committees.  *PI Mem. Op.*, 362 F. Supp. 2d at 48.  In particular, because the "funds expended" allocation method based the allocation ratio only on "amounts contributed to or otherwise spent on behalf of specific federal candidates," 11 C.F.R. § 106.6(c)(1) (2002), the method at times allowed nonconnected committees to calculate the federal portions of their allocated spending at, or close to, zero.  *See PI Mem. Op.*, 362 F. Supp. 2d at 48 (citing PI Admin. Record, Ex. 1 (Letter to FEC from Democracy 21) at 2; *id*. Ex. 10 (Facsimile to FEC from Democracy 21) at 2-3; *id*. Ex. 266 (Letter from McCain, Feingold, Shays, Meehan to Mai T. Dinh)).  In addition, the "funds expended" allocation method did not subject nonconnected political committees to a minimum federal allocation percentage.  *See* 11 C.F.R. § 106.6 (2002).

In February 2004, the FEC issued Advisory Opinion 2003-37, requiring that nonconnected political committees pay for any public communication that "promotes, supports, attacks, or opposes" federal candidates entirely with federal funds.  Pl.'s MSJ, Attach. C (Advisory Opinion 2003-37); Pl.'s Stmt.¶ 1; FEC Resp. Stmt." ¶ 1.  The FEC simultaneously indicated its intent to undertake a rulemaking with respect to the allocation rules affecting nonconnected political committees.  Pl.'s MSJ, Attach. C (Advisory Opinion 2003-37) at 3 n.3.  On March 11, 2004, the FEC published its official Notice of Proposed Rulemaking ("NPRM"), which was framed largely in response to the Supreme Court's holding in *McConnell*.  *See* 69 Fed. Reg. 11,736-38.[6]  The NPRM sought comment on "whether either BCRA or *McConnell* requires, permits, or prohibits changes to the allocation regulations for separate segregated funds and nonconnected committees."  Political Committee Status, 69 Fed. Reg. 11,736, 11,753 (March 11, 2004) (discussing proposed 11 C.F.R. § 106.6).  The NPRM questioned

> Given *McConnell*'s criticism of the Commission's prior allocation rules for political parties, is it appropriate for the regulations to allow political committees to have non-Federal accounts and to allocate their disbursements between Federal and non-Federal accounts?  If an organization's major purpose is to influence Federal elections, should the organization be required to pay for all of its disbursements out of Federal funds and therefore be prohibited from allocating any of its disbursements?

*Id*. at 11,753.

---

[6] In its motion for preliminary injunction, EMILY's List argued that the challenged FEC regulations were promulgated without sufficient notice under the APA.  *See PI Mem. Op.*, 362 F. Supp. 2d at 48-49, 53-56.  In denying EMILY's List's motion for preliminary injunction, the Court concluded that EMILY's List had not demonstrated a substantial likelihood of success on its claims regarding notice under the APA.  *Id.*  EMILY's List does not raise its notice-related arguments in its revised motion for summary judgment, and the Court therefore does not address the merits of those arguments as they are waived.  *See New York v. United States Envtl. Prot. Agency*, 413 F.3d 3, 20 (D.C. Cir. 2005).

The FEC designated the period through April 9, 2004 for public comments on the proposed rules, and held a hearing on April 14 and 15, 2004.  *See* 69 Fed. Reg. 11,736.  EMILY's List's representatives did not submit any comments and did not testify at the hearing, although over 100,000 comments were filed by other parties–including political committees, political parties, nonprofit organizations, individuals, campaign finance organizations, and Members of Congress–on a variety of issues raised by the rulemaking, and the two days of public hearings included 31 witnesses representing organizations with a broad range of opinions and concerns. FEC Stmt. ¶¶ 22-31; Pl.'s Resp. Stmt. ¶¶ 22-31.  The majority of the comments the Commission received focused on the NPRM's proposals regarding potential changes to the status of certain section 527 organizations that did not register and report to the FEC, Pl.'s Stmt. ¶ 8; FEC Resp. Stmt. ¶ 8; however, a number of commenters offered remarks on the proposed allocation rules and testimony on the proposed revision of the definition of "contributions," *PI Mem. Op.*, 362 F. Supp. 2d at 50 (citations omitted).

In particular, at least one commenter supported eliminating allocation altogether and requiring nonconnected committees to use 100% federal funds for all expenditures under 11 C.F.R. § 106.6, *see* FEC MSJ Ex. 8 (Comments of Public Citizen, at 12-13), while another suggested that communications should be allocated either 100% federal or 100% nonfederal based upon whether federal or nonfederal candidates were mentioned in the communication, *see* FEC MSJ Ex. 9 (Comments of Republican National Committee, at 7-8).  *See also* FEC Stmt. ¶¶ 23, 25; Pl.'s Resp. Stmt. ¶¶ 23, 25.  Other commenters supported implementing a specific percentage or "significant minimum hard money share" for administrative expenses.  FEC MSJ Exs. 10 (Comments of Democracy 21, Campaign Legal Center, Center for Responsible Politics, at 17-19)

and 11 (Comments of Senators McCain and Feingold, Representatives Shays and Meehan, at 3).
*See also* FEC Stmt. ¶ 24; Pl.'s Resp. Stmt. ¶ 24.

One commenter argued that revising the funds expended method to require a federal

minimum share would be too burdensome and complicated for political committees.  FEC MSJ

Ex. 12 (Comments of Media Fund, at 20); FEC Stmt. ¶ 26; Pl.'s Resp. Stmt. ¶ 26.  In contrast,

during the hearing, testimony was offered regarding the complexities of the funds expended

allocation method and the FEC's proposal to move to a flat minimum percentage, including a

50% federal minimum, for allocated expenses.  FEC MSJ Ex. 14 (Apr. 14, 2004 Hrg. Tr.) at 158-

60 (testimony of Craig Holman) and Ex. 15 (Apr. 15, 2004 Hrg. Tr.) at 78-80 (testimony of

Lawrence Noble) and 80-84 (testimony of Robert Bauer).  In addition, one witness testified that

the funds expended allocation method permitted circumvention of BCRA's aim that soft money

not be used to fund federal campaign activities.  *Id.* at 78-80 (testimony of Lawrence Noble).[7]

---

[7] Mr. Noble's testimony referred to the activities of Americans Coming Together (ACT), a registered nonconnected political committee with a separate registered nonfederal account. *See* FEC Ex. 16 (FEC News Release, *FEC to Collect $775,000 Civil Penalty From America Coming Together* (Aug. 29, 2007)).  The *amicus* brief filed in this action by Senators McCain and Feingold, Representative Shays, Democracy 21, and the Campaign Legal Center focuses largely on ACT's activities and the conciliation agreement eventually reached between ACT and the FEC, which settles allegations that during the 2004 election ACT used federal/nonfederal allocation ratios that greatly under-represented the proportion of its disbursements required to be paid with federal funds.  FEC MSJ at 23 & n.21; Ex. 17 (Conciliation Agreement).  As the FEC explains:

> For most of the 2004 election cycle, ACT used an allocation ratio of just 2% federal funds and 98% nonfederal funds for its administrative expenses and generic voter drives. [FEC Ex. 17] Conciliation Agreement at 2-3, 6.  The Commission concluded that approximately $70 million dollars in disbursements characterized by ACT as "administrative expenses" for door-to-door canvassing, direct mail, and telemarketing were actually attributable to clearly identified federal candidates and thus were required to be paid with 100% federal funds.  *Id.* at 7.  The Commission further found that another $70 million in voter drive costs were directly attributable at least in part to clearly identified federal candidates,

Finally, witnesses addressed the FEC's proposal that money given in response to solicitations indicating that the funds received would be used to support or oppose a federal candidate would be treated as contributions under FECA.  *Id.* at 202-03 (testimony of Lyn Utrecht) and 207-08 (testimony of Margaret McCormick).

The FEC published the final rules and an accompanying Explanation and Justification ("E&J") in the Federal Register on November 23, 2004, and the final rules became effective on January 1, 2005.  *See* 29 Fed. Reg. 68,056.  Pursuant to the new rule at 11 C.F.R. § 100.57(a), all funds received in response to a solicitation are treated as "contributions" under FECA "if the communication indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate."  11 C.F.R. § 100.57(a).  If, however, the

---

and thus should have been paid either with 100% federal funds or allocated between federal and nonfederal candidates based on the time and space devoted to the candidates.  *Id.* at 9.  ACT agreed to pay a $775,000 civil penalty and to cease and desist from violating the relevant statutory and regulatory restrictions and reporting requirements.  *Id.* at 12.

FEC MSJ at 23 & n.21.  The FEC also concluded that, with respect to the $30 million in disbursements that ACT properly treated as administrative and generic voter drive expenses, it should have used an allocation of at least 90% federal and 10% nonfederal funds.  FEC Ex. 16 (Press Release).

*Amici* further explain that ACT based its 2%/98% federal to nonfederal ratio only on spending that it identified as candidate-specific, as permitted by the rules then in effect; however, ACT's President's public statements made clear that the organization's purpose was to oppose President George W. Bush's re-election in 2004 and the organization focused its efforts on seventeen "battleground" states in the 2004 presidential election.  *Amicus* Br. at 14-17; FEC Ex. 17 (Conciliation Agreement) at 4.  After the Commission announced, in Advisory Opinion 2003-37, that it intended to undertake a rulemaking on the issues, the organizational *amici* (along with the Center for Responsive Politics) wrote to the Commission and brought ACT's activities to the Commission's attention.  *Amicus* Br. at 19-20 (citing 2/25/04 Letter to FEC Commissioners, *available at* http://www.fec.gov/pdf/nprm/political_comm_status/exparte_commisioners.pdf.  A copy of the organizational *amici*'s letter is included in the rulemaking record.  In addition, the organizational *amici* and the Center for Responsive Politics submitted comments during the comment period that specifically referenced ACT.  *See* http://www.fec.gov/pdf/nprm/poltical_comm_status/simon_potter_nobel_sanford.pdf.

Commission's rules would permit the costs of the solicitation to be allocated between federal and

nonfederal funds, funds received in response may be treated differently.  *Id.* § 100.57(b).

Specifically, if the solicitation refers to a clearly identified federal candidate and a political party,

but not to a clearly identified nonfederal candidate, all funds received in response are considered

contributions.  *Id.* § 100.57(b)(1).  In contrast, if the solicitation refers to one or more clearly

identified nonfederal candidates, in addition to a clearly identified federal candidate, at least fifty

percent of the funds received in response must be treated as contributions, regardless of whether

the solicitation also refers to a political party.  *Id.* § 100.57(b)(2).

As revised, 11 C.F.R. § 106.6 replaced the "funds expended" method for allocation by

nonconnected political committees with a 50 percent federal funds minimum for administrative

expenses, costs of generic voter drives, and costs of public communications that refer to a political

party but do not refer to any specific candidates.  *See* 11 C.F.R. § 106.6(c).  In addition, section

106.6(f) provides that public communications and voter drives that refer to one or more clearly

identified federal candidates, and do not refer to any nonfederal candidates, must be financed with

100 percent federal funds, regardless of whether political parties are also mentioned.  *See id.* §

106.6(f)(1).  In contrast, public communications and voter drives that refer only to nonfederal

candidates, or refer to a political party and only nonfederal candidates, may be financed with 100

percent nonfederal funds.  *Id.* § 106.6(f)(2).  Finally, expenses for "communications and voter

drives that refer to one or more clearly identified Federal candidates and one or more clearly

identified non-Federal candidates, regardless of whether there is a reference to a political party,"

are to be "allocated based on the proportion of space or time devoted to each clearly identified

Federal candidate as compared to the total space or time devoted to all clearly identified

candidates." *Id.* § 106.6(f)(3).

On August 18, 2005, EMILY's List submitted an Advisory Opinion Request to the FEC seeking clarification regarding the new regulations.  In particular, EMILY's List asked whether, as a nonconnected political committee, it would be required to pay at least 50% of its administrative expenses and generic voter driver expenses with federal funds, even if its budget "committe[d] [it] to the expenditure of 65% of its candidate budget for the [remainder of the 2005-2006 election] cycle on contributions to or amounts otherwise spent on behalf of specific nonfederal candidiates."  Pl.'s Attach. D (8/18/05 Advisory Opinion Request) at 1.  The FEC's responsive Advisory Opinion 2005-13 confirmed that EMILY's List was required to allocate a minimum of 50% federal funds "without regard to how much a Federal political committee may choose to spend on non-Federal elections."  Pl.'s Attach. E (Advisory Opinion 2005-13) at 2-3.

In its Advisory Opinion Request, EMILY's List also described a proposed fundraising solicitation "in support of its efforts on behalf of state legislative candidates" that would refer to Senator Debbie Stabenow of Michigan and "feature a discussion of her own experiences, earlier in her career, as a candidate for State Senate in Michigan," in order to "stress the importance of successes for women in state elective office."  Pl.'s Attach. D (Advisory Opinion Request) at 1-2. EMILY's List explained that the solicitation would not be distributed in Michigan and would not reference Senator Stabenow's "federal candidacy or solicit funds for her federal candidacy."  *Id.* at 2.  In addition, the proposed communication would not refer to any clearly identified nonfederal candidate, but only generally to nonfederal Democratic women candidates as a class, and EMILY's List asked the Commission whether the funds raised by the communication would be required to be treated entirely as contributions.  *Id.*

13

In response, the FEC's Advisory Opinion 2005-13 clarified that, "[r]egardless of its context, the reference to Senator Stabenow in EMILY's List's public communication is a reference to a clearly identified Federal candidate in a Federal political committee's public communication," which does not refer to a clearly identified nonfederal candidate, such that, "EMILY's List must pay for the public communication that clearly identifies Senator Stabenow with 100 percent Federal funds."  Pl.'s Attach. E (Advisory Opinion 2005-13) at 3-4.  In response to a suggestion by EMILY's List that it could substitute a federal candidate not standing for election in 2006 for Senator Stabenow, the Commission further noted that the "analysis does not change if a candidate for election in a year other than 2006 were to be substituted for Senator Stabenow in EMILY's List's public communication."  *Id.* at 4.  The FEC noted that neither FECA "nor Commission regulations distinguish between candidates based on election date," rather, FECA defines a "candidate" as "an individual who seeks nomination for election, or election, to Federal office," and defines an individual as seeking "nomination for election, or election, if he or she has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000."  *Id.* (citing 2 U.S.C. § 431(2)(A); 11 C.F.R. 100.3(a)(1)).

In addition to generally requesting clarification on whether its communication referring to Senator Stabenow would have to be funded with federal funds, EMILY's List's Advisory Opinion Request asked the Commission to review three proposed options for the portion of the communication asking recipients "to support the nonfederal programs of EMILY's List," with the caveat that EMILY's List "wish[ed] to avoid any language that would be construed to 'indicate' a use of the funds to support federal candidates, including but not limited to Senator Stabenow."  Pl.'s Attach. D (Advisory Opinion Request) at 2.  Specifically, EMILY's List proposed the

14

following texts:

> (a) "We are asking for your support, so that EMILY's List can support candidates
> who, like me, could never succeed as women in politics without the combined
> commitment of all [sic] us."

> (b) "EMILY's List's support over the years for candidates like me has made an
> enormous difference to the progress of women toward equality in the pursuit of
> political office.  But we have a long way to go.  That's why I need your help."

> (c) "EMILY's List has always supported me (Senator Stabenow) when I most
> needed it.  And that is why I am asking you to support EMILY's List today, so
> that it can continue the work on behalf of women who, by seeking state office
> today, will be ready to claim national leadership tomorrow."

*Id.*

In response to this question, the Commission's Advisory Opinion 2005-13 explained that

"[a]ll three communications indicate that the funds EMILY's List receives in response will be

used to support candidates and implicitly to support their election to office.  The only question is

whether these communications indicate that Senator Stabenow is among those candidates."  *Id.* at

5-6.  Specifically, the FEC concluded that, EMILY's List's Example (a) "indicates that [Senator

Stabenow] is among the candidates that EMILY's List will support," such that all funds received

in response to a solicitation including the text in Example (a) would be treated as contributions

under 11 C.F.R. § 100.57.  *Id.* at 6.  The Commission reached the same conclusion with respect to

EMILY's List's Example (b), noting that the language "I need your help" suggests that "Senator

Stabenow is also appealing on her own behalf," and "indicates that some of the funds raised will

be used to support Senator Stabenow's re-election, which satisfies 11 CFR 100.57(a)(1)."  *Id.*

While EMILY's List's Example (c) "also features a clearly identified Federal candidate raising

funds for EMILY's List," the Commission concluded that "it indicates those funds will be used on

15

behalf of women seeking State office," and therefore "does not indicate that any portion of the funds received will be used to support [Senator Stabenow's] re-election." *Id.* Accordingly, the Commission advised EMILY's List that it could consider any funds received in response to a solicitation including the language in Example (c) "to be donations to its non-Federal account." *Id.* at 6-7.

Finally, EMILY's List's Advisory Opinion Request stated that it "expect[ed] to implement its nonfederal objections by making public communications in support of state legislative initiatives and referenda," which "would not name a federal or nonfederal candidate, but would appeal to Democratic women to support or oppose these initiatives." Pl.'s Attach. D (Advisory Opinion Request) at 3. EMILY's List asked the Commission to clarify whether "the reference to Democrats in these communications requires that the associated costs be paid at least 50% with funds raised under the restrictions of federal law," and whether the answer to that question "depend[ed] on whether EMILY's List otherwise only supports nonfederal candidates in that state in this cycle." *Id.* In response, the FEC's Advisory Opinion 2005-13 noted the E&J for the revised regulations, which stated that "references solely to a political party inherently influence both Federal and non-Federal elections. Therefore, the 50% Federal funds requirement reflects the dual nature of the communication." Pl.'s Attach. E (Advisory Opinion 2005-13) at 4. The FEC clarified that "[a] discussion of a State legislative initiative or referendum does not alter the application of these rules," and reminded EMILY's List that if it were to remove the reference to "Democrats" from the communications, EMILY's List would be permitted to pay for the communications with 100% nonfederal funds. *Id.* at 4-5. The Commission also clarified that the "analysis that EMILY's List must pay the costs of public communications that refer to a political

16

party with at least 50 percent Federal funds does not change based on the activities of EMILY's

List in the particular State." *Id.* at 5.

### C.     EMILY's List's Historical and Present-Day Activities

The parties do not dispute the following facts regarding EMILY's List's reported historical

activities:

- In the 2001-2002 election cycle, EMILY's List raised more than $15.5 million in federal contributions and more than $5.5 million in nonfederal funds. FEC Stmt. ¶ 5; Pl.'s Resp. Stmt. ¶ 5. In that cycle, EMILY's List reported total federal disbursements of over $17.2 million, and reported total allocated spending of $11.2 million, which was financed with approximately $5.6 million in federal funds and $5.6 million in nonfederal funds. *Id.*

- In the 2003-2004 election cycle, EMILY'S LIST raised more than $25 million in federal contributions and more than $8 million in nonfederal funds. FEC Stmt. ¶ 6; Pl.'s Resp. Stmt. ¶ 6. In that cycle, EMILY's List reported total federal disbursements of approximately $26 million, and reported total allocated spending of $16.2 million, which was financed with approximately $8.1 million in federal funds and $8.1 million in nonfederal funds. *Id.*

- In the 2005-2006 election cycle, EMILY'S LIST again raised more than $25 million in federal contributions and more than $7.8 million in nonfederal funds. FEC Stmt. ¶ 7; Pl.'s Resp. Stmt. ¶ 7. In that cycle, EMILY's List reported total federal disbursements of over $26 million, and reported total allocated spending of $15.3 million, which was financed with approximately $7.5 million in federal funds and $7.8 million in nonfederal funds. *Id.*

- For the 2007-2008 election cycle, EMILY'S LIST reported raising over $8.1 million in federal contributions and more than $2.9 million in nonfederal funds through August 31, 2007. FEC Stmt. ¶ 8; Pl.'s Resp. Stmt. ¶ 8. In the same period, EMILY's List reported total federal disbursements of over $7.1 million, and reported total allocated spending of $5.9 million, which was financed with approximately $2.9 million in federal funds and $2.9 million in nonfederal funds. *Id.* EMILY's List's fundraising and spending totals in the first third of 2005-2006 and 2007-2008 election cycles exceed the totals at the same point in the comparable

election cycles of 2001-2002 and 2003-2004, respectively.  FEC Stmt. ¶ 9; Pl.'s Resp. Stmt. ¶ 9.

•       During the ten years prior to the promulgation of the revised regulations at issue in this case, EMILY's List never reported an allocation ratio of federal and nonfederal funds of less than 50%.  FEC Stmt. ¶ 11; Pl.'s Resp. Stmt. ¶ 11.  At the end of the 1995-1996 election cycle, EMILY's List reported a final allocation ratio of 70% federal candidate support and 30% nonfederal.  *Id.*

•       EMILY's List has described itself as "the nation's largest political action committee," and its president, Ellen Malcom, has stated that EMILY's List has "the most hard money, so it's not an issue of not having it."  FEC Stmt. ¶ 10; Pl.'s Resp. Stmt. ¶ 10 (quoting EMILY's List, Press Release, Feb. 1, 2007, *available at* http://www.emilyslist.org/newsroom/ releases/20070201.html, and Liz Sidoti, "Bush, Kerry to Pull Ads on Friday," Associated Press Newswires, June 7, 2004 (FEC MSJ, Ex. 3)).

The remainder of the EMILY's List's factual assertions regarding its activities are more hotly contested.  In particular, EMILY's List's Statement of Material Facts describes one specific program–its "Campaign Corps" program–that EMILY's List asserts will be affected by the 50% federal fund minimum in the revised allocation regulation.  Pl.'s Stmt. ¶¶ 29-31.  According to EMILY's List, each year, the Campaign Corps program "trains talented individuals just out of college at an intense week-long Campaign School and then places them on campaigns for the last 3 months of the campaign."  *Id.* ¶ 29.[8]  EMILY's List explains that in odd-numbered years, when there are no regularly scheduled federal elections, "the vast majority of students are placed on campaigns for state and local office in New Jersey and Virginia, which hold elections in these years.  In even years, graduates are placed with both federal and nonfederal campaigns."  *Id.* ¶ 30.

_____

[8] The Commission "objects to [this fact] as conclusory, speculative, and without foundation, because [it relies] upon the Cocanour Declaration."  FEC Resp. Stmt. ¶¶ 29-30. Given her position as EMILY's List Assistant Treasurer and Chief of Staff, Ms. Cocanour's Declaration generally provides sufficient factual support for EMILY's List's description of its Campaign Corps program's activities in the past.

EMILY's List also asserts–based upon Ms. Cocanour's Declaration–that "[d]uring the 2006 election cycle, 77% of the graduates trained by the program ultimately worked on nonfederal races." *Id.* ¶ 31.   EMILY's List also asserts that it will continue to sponsor the Campaign Corps program during the 2007-2008 election cycle, *id.* ¶ 34, and that, but for revised regulation 11 C.F.R. 106.6, it "would pay for this expense with a higher proportion of nonfederal funds, to reflect its predominantly nonfederal purpose," *id.* ¶ 33.   As the Commission correctly notes, however, EMILY's List does not specify whether its 2006 Campaign Corps graduates worked solely on nonfederal races, or whether they also spent substantial time working on federal races or on generic campaign activity.   FEC Resp. Stmt. ¶ 31.   The Court therefore agrees with the Commission that EMILY's List's statement that the Campaign Corps program has a "predominantly nonfederal purpose" is conclusory.

EMILY's List also asserts that it "has found that the use of the names, association with EMILY's List and endorsements of certain well-known federal candidates and officeholders are uniquely effective at raising funds for EMILY's List and its efforts on behalf of federal and nonfederal candidates."   Pl.'s Stmt. ¶ 36; Cocanour Decl. ¶ 18.[9]   According to EMILY's List, prior to the revised regulations, it had made solicitations to raise funds for nonfederal programs that specifically referred to clearly identified federal candidates, but did not refer to any clearly identified nonfederal candidates, and it deposited some funds received as a result of those solicitations in nonfederal accounts.   Pl.'s Stmt. ¶ 38; Cocanour Decl. ¶ 20.   EMILY's List

---

[9] Again, the Commission objects to these statements as "vague, speculative, and without foundation, because they rely upon the Cocanour Declaration."   FEC Resp. Stmt. ¶ 36.   In light of her position, however, Ms. Cocanour's Declaration is sufficient factual support insofar as it describes EMILY's List's past activities.

continues to state that "[a]s a result of the new regulations, [it] has altered its solicitations in order to be able to accept nonfederal funds as a result of a solicitation," either by eliminating references to clearly identified federal candidates in solicitations or by adding references to clearly identified nonfederal candidates.  Pl.'s Stmt. ¶ 39; Cocanour Decl. ¶ 21.

Specifically, EMILY's List proffers a solicitation it sent to supporters that includes references to federal candidates–Senators Debbie Stabenow, Maria Cantwell, Dianne Feinstein, and Hillary Clinton, as well as Representatives Gwen Moore, Allyson Schwartz, and Melissa Bean–and also refers to Arizona Governor Janet Napolitano.  *See* Pl.'s MSJ, Attach. A. According to EMILY's List, the reference to Governor Napolitano "was included solely so that some funds could be treated as nonfederal contributions, for use in local and state elections."  Pl.'s Stmt. ¶ 39; Cocanour Decl. ¶ 21.  EMILY's List also proffers five advertisements supporting two ballot initiatives in Missouri that EMILY's List paid for and distributed, which do not contain any references to clearly identified federal candidates.  *See* Pl.'s MSJ, Attach. B.  EMILY's List asserts that it "would have preferred to include a reference to a clearly identified federal candidate in these advertisements to endorse the ballot initiatives while continuing to pay for them with nonfederal funds," but declined to include such a reference because doing so would have required EMILY's List to fund the advertisements entirely with federal funds, in light of the lack of reference to a clearly identified nonfederal candidate.  Pl.'s Stmt. ¶ 45; Cocanour Decl. ¶ 27.

The Commission generally objects to EMILY's List's statements, asserting that they are "conclusory, speculative, and without foundation, because they rely on the Cocanour Declaration," and specifically objects to EMILY's List's assertion that it "would have preferred" to include a reference to a federal candidate in its ballot initiative advertisements as vague and

speculative. FEC Resp. Stmt. ¶¶ 38-42; 45. The Court finds, however, that in light of her position as EMILY's List's Assistant Treasurer and Chief of Staff, Ms. Cocanour's Declaration provides sufficient factual support for EMILY's List's description of specific choices the organization made as a result of the revised regulations. In contrast, to the extent that EMILY's List's Statement of Material Facts (and Ms. Cocanour's Declaration) includes various assertions regarding possible future activities EMILY's List may undertake, the Court generally agrees with the Commission that those assertions are speculative. The Court need not–and does not–parse the FEC's specific objections to the remainder of the factual assertions contained in EMILY's List's Statement of Material Facts because the Court's resolution of the pending cross-motions for summary judgment, below, is premised on legal, rather than factual, grounds. To the extent that the Court has set forth facts above regarding EMILY's List's historical activities, those facts are necessary to the Court's analysis of EMILY's List's standing to bring this action. However, as the Court need not consider EMILY's List's potential future activities in resolving the legal questions dispositive on the pending cross-motions for summary judgment, the Court declines to do so.

### D.    *Procedural History*

As noted above, the challenged regulations went into effect on January 1, 2005, and EMILY's List filed its Complaint and Motion for Preliminary Injunction on January 12, 2005. The Court denied EMILY's List's Motion for Preliminary Injunction in a Memorandum Opinion and Order dated February 25, 2005, which was affirmed by the D.C. Circuit on appeal on December 22, 2005. *See PI Mem. Op.*, 362 F. Supp. 3d 43; *EMILY's List v. FEC*, 170 Fed. Appx. 719 (D.C. Cir. 2005). In the interim, the parties briefed cross-motions for summary judgment. After those cross-motions were fully briefed, on June 25, 2007, the Supreme Court issued its

decision in *Federal Election Commission v. Wisconsin Right to Life.*  On July 12, 2007, the Court denied the parties' initial cross-motions for summary judgment without prejudice and ordered the parties to file revised briefing that accurately reflected the state of the law.  *See* 7/12/07 Order, Docket No. [29].  Briefing on the parties' revised cross-motions is now ripe and, in addition, the Court has received an *amicus* brief filed by Senators John McCain and Russell Feingold, Representative Christopher Shays, Democracy 21, and the Campaign Legal Center in opposition to Plaintiff's revised motion for summary judgment.

## II.  LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C. Cir.1992).  Furthermore, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975); *Long v. Gaines,* 167 F. Supp. 2d 75, 85 (D.D.C. 2001).  Each moving party discharges its burden to support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting Fed. R. Civ. P. 56(c)).  In opposing a motion for summary judgment, a party must "go

beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'"  *Id.* at 324.

### III.  DISCUSSION

In addressing the pending cross-motions, the Court first–as it must–considers the

Commission's argument that EMILY's List lacks standing to bring its claims.  After concluding

that EMILY's List has standing, the Court turns to the merits of EMILY's List's First Amendment

and APA claims, in that order.  Although EMILY's List brings separate claims under the First

Amendment and the APA, which require the Court to apply very different forms of analysis, the

parties's briefs (particularly those of the FEC) do not clearly delineate their arguments as to each

claim and do not engage in the precise First Amendment analysis required and discussed below.

This imprecision greatly complicates the Court's task in evaluating the parties' arguments.

Nevertheless, the Court has attempted to parse the parties' briefs to discern which arguments

relate to each claim.  Ultimately, the Court finds, for the reasons discussed below, that the

Commission is entitled to Summary Judgment on all of EMILY's List's claims.[10]

---

[10] As discussed in the Background section above, the FEC repeatedly challenges
EMILY's List's reliance on Ms. Cocanour's Declaration in its response to EMILY's List's
Statement of Material Facts.  The Commission repeats this challenge in its memorandum in
support of its motion for summary judgment, generally asserting that "EMILY's List has failed to
provide evidence sufficient to support its own motion for summary judgment" because its
Statement of Material Facts relies primarily on Ms. Cocanour's Declaration for factual support.
*See* FEC MSJ at 12.  The Court has already concluded that Ms. Cocanour is the Assistant
Treasurer and Chief of Staff of EMILY's List and is thus in a position of knowledge as to
EMILY's List's past activities and specific actions EMILY's List has taken (or declined to take)
in light of the revised regulations.  Her averments in that regard therefore constitute sufficient
support for EMILY's List's factual assertions with respect to specific past activities.  In contrast,

### A.    Standing

As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine."  *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen*, 468 U.S. at 750).  These doctrines incorporate both the prudential elements, which "Congress is free to override," *id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1278 (D.C. Cir.1994)) (internal quotations omitted), and "core component[s]" which are "essential and unchanging part[s] of the case-or-controversy requirement of Article III," *id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations omitted)).  In order to satisfy the constitutional standing requirements, a plaintiff must establish that he or she has (1) suffered an injury in fact, which is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) which is fairly traceable to the challenged act, and (3) is likely to be redressed by a favorable decision.  *Id.*

The Commission focuses its standing argument on the injury-in-fact element, asserting that EMILY's List has not been required to alter its practices as a result of the new 50% federal funds minimum requirement for administrative expenses at 11 C.F.R. § 106.6(c) because it is undisputed that in the ten years proceeding the new regulations, EMILY's List never reported less

---

insofar as EMILY's List makes various assertions regarding its potential future activities, the Court generally agrees with the Commission that those assertions are speculative.  However, as discussed above, the Court need not rely upon those assertions in resolving the pending cross-motions for summary judgment because the dispositive issues are legal, rather than factual, in nature.

than a 50% federal to nonfederal ratio, and EMILY's List has not proffered evidence that it plans

to significantly alter its spending practices.  FEC MSJ at 13.  The Commission also argues that

EMILY's List suffers no injury-in-fact as a result of the allocation and solicitation regulations

because they do not prohibit EMILY's List "from engaging in electoral speech or in any of the

other campaign activities listed in the regulations" and "impose no expenditure ceiling."  *Id.* at 13-

14.  As discussed in greater detail below, and as this Court previously concluded in its

Memorandum Opinion denying EMILY's List's Motion for Preliminary Injunction, "the new rules

do not in fact prevent Plaintiff from engaging in whatever political speech it seeks to undertake."

*PI Mem. Op.*, 362 F. Supp. 2d at 58.  As such, the Court rejects EMILY's List's assertions that it

"has been forced to alter its communications."  Pl.'s MSJ at 10.

Nevertheless, the Court finds that EMILY's List has demonstrated an injury-in-fact insofar

as it has actually altered its communications in light of the new regulations.  Specifically,

EMILY's List has proffered a specific solicitation, discussed above, that includes references to

both clearly identified federal candidates and to Arizona Governor Janet Napolitano, *see* Pl.'s

MSJ at 10-12 & Attach. A, and Ms. Cocanour's Declaration establishes that the reference to

Governor Napolitano in that solicitation "was included solely so that some funds could be treated

as nonfederal contributions, for use in local and state elections."  Pl.'s Stmt. ¶ 39; Cocanour Decl.

¶ 21.  EMILY's List has also proffered the five ballot initiative advertisements discussed above,

and established that it "would have preferred to include a reference to a clearly identified federal

candidate in these advertisements to endorse the ballot initiatives" but declined to do so because it

would have required EMILY's List to fund the advertisements entirely with federal funds in light

of the lack of reference to a clearly identified nonfederal candidate.  Pl.'s MSJ at 12-14 & Attach.

25

B; Pl.'s Stmt. ¶ 45; Cocanour Decl. ¶ 27.  At the summary judgment stage, "the plaintiff [may not]

rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,'

which for the purposes of the summary judgment motion will be taken to be true."  *Lujan*, 504

U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).  Here, Ms. Cocanour's Declaration sufficiently

establishes that EMILY's List has ordered its conduct, in ways it otherwise would not have, in

order to comply with the new allocation and solicitation regulations.  As such, EMILY's List has

established an injury-in-fact, suffered as a result of 11 C.F.R. §§ 100.57 and 106.6(f), which

would be alleviated if the regulations were invalidated.  EMILY's List thus has standing to

challenge 11 C.F.R. §§ 100.57 and 106.6(f).  *Cf. Becker v. FEC*, 230 F.3d 381, 386 (1st Cir. 2000)

(concluding that "an impact on the strategy and conduct of an office-seeker's political campaign

constitutes an injury of a kind sufficient to confer standing.") (quoting *Vote Choice Inc. v.

DiStefano*, 4 F.3d 26, 37 (1st Cir. 1993)).

    As to the 50% minimum allocation requirement for administrative expenses and generic

voter drives contained in revised 11 C.F.R. § 106.6(c), EMILY's List does not dispute its past

allocation ratios and thus does not attempt to argue that it has suffered an injury-in-fact by virtue

of significantly altering its allocation ratios.  EMILY's List Reply at 4.  Instead, EMILY's List

asserts that it would–if permitted by the regulations–pay for certain administrative expenses, such

as its Campaign Corps program, with more nonfederal funds than federal funds.  *Id.*  As discussed

above, EMILY's List's description of its Campaign Corps program lacks sufficient detail to

establish–as EMILY's List asserts–that the program has a "predominantly nonfederal purpose."

*See* Pl.'s Stmt. ¶ 31.  Nevertheless, Ms. Cocanour's Declaration is sufficient to establish that

EMILY's List has ordered its funding for the Campaign Corps program, in a way it otherwise

would not have, based on the allocation regulation.  As such, the Court finds that EMILY's List

has established an injury-in-fact stemming from, and thus its standing to challenge, the regulation.

While the Court's discussion above establishes that EMILY's List has standing to

challenge the new allocation and solicitation regulations on its own behalf, EMILY's List does not

bring an as-applied challenge.  Instead, EMILY's List brings a facial challenge to the rules,

asserting that it may do so "[u]nder the First Amendment overbreadth doctrine" because "an

individual whose own speech or conduct may be prohibited is permitted to challenge a statute on

its face 'because it also threatens others not before the court-those who desire to engage in legally

protected expression but who may refrain from doing so rather than risk prosecution or undertake

to have the law declared partially invalid.'"  Pl.'s MSJ at 10 (quoting *Bd. of Airport Comm'rs of

City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Brockett v. Spokane

Arcades, Inc.*, 472 U.S. 491, 503 (1985)).

The Commission contests this assertion, arguing–albeit not strenuously–that EMILY's List

lacks standing to bring a facial challenge because the overbreadth doctrine only applies where

"there is a realistic danger that the statute itself will significantly compromise recognized First

Amendment protections of parties not before the Court."  FEC MSJ at 14-15 (quoting *City

Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801-02 (1984)).  The Commission

is correct that EMILY's List's Statement of Material Facts does not include specific allegations of

First Amendment injuries suffered by parties not before the Court as a result of the regulations at

issue in this case.  This failing, however, goes more to EMILY's List's ability–discussed in detail

below–to meet the high standard required to demonstrate that a regulation is unconstitutional on

its face.  To the extent that EMILY's List has altered its conduct in order to comply with the

regulations, other political committees likely have as well and, insofar as EMILY's List could

establish that the regulations violate the First Amendment, their mere existence would

"significantly compromise recognized First Amendment protections of parties not before the

Court." *Taxpayers for Vincent*, 466 U.S. 801-02.  EMILY's List certainly could have, and should

have, proffered more evidence of how it asserts the revised regulations have impacted or will

impact the First Amendment freedoms of others not before the Court, as its showing in that

respect is weak.  Nevertheless, in the context of free speech, litigants "are permitted to challenge a

statute not because their own rights of free expression are violated, but because of a judicial

prediction or assumption that the statute's very existence may cause others not before the court to

refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S.

601, 612 (1973).  Although it is a close call, the Court finds that this principle is sufficient to tilt

the balance, and concludes that EMILY's List has standing to assert its facial challenge to the

regulations.  The Court therefore turns to the merits of that claim.

> **B.     First Amendment**

EMILY's List's First Amendment claim is premised on its assertion that "[i]t is unable,

without risking enforcement action by the FEC, to conduct [its] nonfederal activities without

complying with draconian federal financing rules."  Pl.'s MSJ at 15.  In order to assess the validity

of this claim, the Court must reach some initial conclusions regarding the type of activity

EMILY's List asserts is affected by the revised regulations and the resulting level of scrutiny to be

applied to EMILY's List's First Amendment claim.  The Court also addresses at the outset the

general applicability of the Supreme Court's decision in *Wisconsin Right to Life* to EMILY's

List's facial overbreadth challenge.  These initial considerations are essential to framing the

Court's consideration of EMILY's List's First Amendment claim.

       *1.*    *The Revised Allocation and New Contribution Regulations Are*
                *Contribution Limits, Subject to Lesser Scrutiny*

      Since *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court has subjected limits on

campaign contributions to lesser scrutiny than the "strict scrutiny" applied to restrictions on

campaign expenditures.  *See Buckley*, 424 U.S. at 19; *McConnell*, 540 U.S. at 134-36; *FEC v.*

*Beaumont*, 539 U.S. 146, 161 (2003); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377,

387-88 (2000).  In so doing, the Supreme Court has "recognized that contribution limits, unlike

limits on expenditures, 'entail only a marginal restriction upon the contributor's ability to engage

in free communication.'"  *McConnell*, 540 U.S. at 134-35 (quoting *Buckley*, 424 U.S. at 20; citing

*Beaumont*, 539 U.S. at 151; *Shrink Missouri*, 528 U.S. at 386-88).  In addition, contribution limits

do not pose the same danger to associational rights as expenditure restrictions because the

"'overall effect' of dollar limits on contributions is 'merely to require candidates and political

committees to raise funds from a greater number of persons."  *Id.* at 136 (quoting *Buckley*, 424

U.S. at 21-22).  As a result, the Supreme Court has concluded that "contribution limits impose

serious burdens on free speech only if they are so low as to 'prevent candidates and political

committees from amassing the resources necessary for effective advocacy.'" *Id.* at 135 (quoting

*Buckley*, 424 U.S. at 21) (alterations omitted).  Therefore, as opposed to expenditure limits–which

must be narrowly tailored to serve a compelling governmental interest, *see Beaumont*, 539 U.S. at

162–a contribution limit is "valid if it satisfies the 'lesser demand' of being 'closely drawn' to

match a 'sufficiently important interest.'" *McConnell*, 540 U.S. at 136 (quoting *Beaumont*, 539

U.S. at 162 (quoting *Shrink Missouri*, 528 U.S. at 387-88)).

EMILY's List does not dispute that contribution limits are subject to lesser scrutiny, Pl.'s MSJ at 19, and concedes that such lesser scrutiny applies to the solicitation regulation it challenges, 11 C.F.R. § 100.57, because the rule dictates whether funds received must be treated as contributions under FECA, *id.* at 28-29.  In contrast, however, EMILY's List maintains that the allocation regulations, 11 C.F.R. § 106.6 (c) and (f), are subject to strict scrutiny because they are restrictions on speech and nonfederal election activity.  *See id.* at 18-20.  EMILY's List's arguments are belied by this Court's findings in denying EMILY's List's Motion for Preliminary Injunction, as well as by the Supreme Court's analysis of allocation regulations applicable to state and local parties in *McConnell*.  First, to the extent that EMILY's List suggests that the allocation regulations compel it to engage in, or refrain from, certain speech, the Court previously rejected such a claim, finding that

> the new rules do not in fact prevent Plaintiff from engaging in whatever political speech it seeks to undertake.  While under the new allocation rule, committees such as EMILY's List are required to fund certain types of communications using at least 50 percent federal funds, this does not limit their right to undertake their desired political expression.  In considering contribution limits in *Buckley*, the Supreme Court held that "the overall effect of [FECA] contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons." *Buckley*, 424 U.S. at 21-22.  Indeed, the same rationale is applicable to Plaintiff's present situation; Plaintiff is free to undertake the same political speech as before, but may be required to raise money from a greater number of donors [in light of the contribution limits applicable to political committees under FECA].

*PI Mem. Op.*, 362 F. Supp. 2d at 58.  The Court's prior analysis holds true.  While the allocation regulations at issue in this case may affect the manner in which EMILY's List must fund the speech in which it chooses to engage, they do not in any way limit the political speech that

EMILY's List may undertake.[11]

Moreover, as the FEC correctly highlights, in *McConnell*, the Supreme Court analyzed and upheld BCRA's restrictions–including allocation regulations–on the solicitation and spending of nonfederal funds by political parties. *See* 540 U.S. at 138-40.  In so doing, the Supreme Court applied lesser scrutiny because the challenged regulations had "only a marginal impact on the ability of contributors, candidates, and parties to engage in effective political speech." *Id.* at 138. The Supreme Court also explicitly rejected a claim that strict scrutiny applied to the regulations because they "restrict[ed] not only contributions but also the spending and solicitation of funds raised outside of FECA's contribution limits," stating that "for purposes of determining the level of scrutiny, it is irrelevant that Congress chose [] to regulate contributions on the demand rather than the supply side." *Id.* (citing *FEC v. National Right to Work Comm.*, 458 U.S. 176, 206-11 (1982)).  According to the Supreme Court, "[t]he relevant inquiry is whether the mechanism adopted to implement the contribution limit, or to prevent circumvention of that limit, burdens speech in a way that a direct restriction on the contribution itself would not," but that was "not the

---

[11] EMILY's List correctly notes that in *WRTL*, the Court stressed that First Amendment concerns are not obviated when regulations allow a speaker to "speak by changing what they say," stating that such an

> argument is akin to telling Cohen that he cannot wear his jacket because he is free to wear one that says "I disagree with the draft," *cf. Cohen v. California*, 403 U.S. 15 [] (1971), or telling 44 Liquormart that it can advertise so long as it avoids mentioning prices, *cf. 44 Liquormart, Inc. v. Rhode Island*, 527 U.S. 484 [] (1996).  Such notions run afoul of the "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 [] (1995)

127 S. Ct. at 2671 n.9.  As explained above, however, in the instant case, EMILY's List is free to engage in whatever political speech it chooses–by mentioning, or refraining from mentioning, any and all federal and nonfederal candidates–the only impact of the challenged regulations is on the manner in which EMILY's List must pay for its speech.

case" for BCRA's restrictions on the use of nonfederal funds by political parties. *Id.* at 138-39.

The Supreme Court's description of the restrictions on political parties at issue in *McConnell* demonstrates that its analysis is equally applicable in the instant case: in *McConnell*, the Supreme Court explained that although BCRA's restrictions prohibited political parties from spending nonfederal funds on federal election activities, they did not limit the total amount of money parties could spend on such activities. *Id.* at 139 (citing 2 U.S.C. §§ 441i(a),(b)). "Rather, they simply limit[ed] the source and individual amount of donations. That they [did] so by prohibiting the spending of soft money [did] not render them expenditure limitations." *Id.* So too, here; EMILY's List may spend as much as it wants on the election activities regulated by 11 C.F.R. § 106.6, but may simply be required to fund all or part those activities with federal funds.

EMILY's List attempts to distinguish *McConnell*'s analysis by asserting that the Supreme Court in that case "was only passing judgment on the use of [soft] money in connection with *federal* elections, and so the ban on nonfederal funds acted only as a contribution limit." Pl.'s MSJ at 19. According to EMILY's List, the instant case is different because the revised allocation regulation impinges on EMILY's List's ability to engage in nonfederal election activity using nonfederal funds. *Id.* This assertion gets to the heart of a key dispute between the parties in this action: EMILY's List characterizes the activities it seeks to fund with soft money as "wholly" or "purely" related to state and local elections, *see* Pl.'s Reply at 1, 14, while the FEC maintains that the activities regulated by the revised allocation rules are "mixed purpose" activities that influence both federal and state or local elections, *see* FEC Reply at 6. For the reasons set forth below, the Court concludes that the FEC has the better of this argument.

FECA defines a contribution as "any gift, subscription, loan, advance or deposit of money

or anything of value made by any person *for the purpose of influencing any election for Federal office*." 2 U.S.C. § 431(8) (emphasis added). Under FECA, contributions must be made with federal funds, but "[d]onations made solely for the purpose of influencing state or local elections are [] unaffected by FECA's requirements and prohibitions." *McConnell*, 540 U.S. at 122. FECA does not dictate how political committees are to fund *mixed* purposes activities, i.e., those activities that influence both federal and state or local elections, and prior to the passage of BCRA, "questions arose concerning the treatment of contributions intended to influence both federal and state elections." *Id.* at 123. "*Although a literal reading of FECA's definition of 'contribution' would have required such activities to be funded with hard money*, the FEC ruled that political parties [as well as political committees, like EMILY's List] could fund mixed-purpose activities . . . in part with soft money" through allocation. *Id.* (emphasis added). This same reading of FECA's statutory language was embraced by Judge Thomas A. Flannery in *Common Cause v. FEC*, 692 F.Supp. 1391 (D.D.C. 1987). *See PI Mem. Op.*, 362 F. Supp. 2d at 55. Specifically, Judge Flannery found that the FEC had the authority to determine what method of allocation to use, if any, for mixed purpose activities, stating, "[i]ndeed, it is possible that the Commission may conclude that *no* method of allocation will effectuate the Congressional goal that *all* money spent by state political committees on [certain] activities permitted in the 1979 amendments [to FECA] be 'hard money under the FECA.'" 692 F. Supp. at 1396. While Judge Flannery was considering the applicability of allocation regulations to state party committees in *Common Cause*, as this Court previously found when it adopted Judge Flannery's reasoning in denying EMILY's List's Motion for Preliminary Injunction, "Judge Flannery's reasoning with respect to the FEC's authority to regulate allocation methods is equally applicable in the instant

context" to political committees such as EMILY's List.  *PI Mem. Op.* at 56 n.9.

The Court sees no reason to revisit the conclusion that the FEC acts within its discretion in adjusting the allocation formulas applicable to mixed purpose activities.  This conclusion, however, does not end the analysis; instead, it again begs the question of whether the activities EMILY's List claims are affected by the revised allocation regulations are, in fact, wholly nonfederal, as EMILY's List maintains, as opposed to mixed purpose activities, as the FEC maintains.  The FEC supports its characterization by demonstrating how each of a set of hypothetical examples EMILY's List offers of alleged nonfederal activity that would be impacted by the allocation regulations, in fact, may influence federal elections.  *See* Pl.'s MSJ at 35-36; FEC MSJ at 27-28.  The Court addresses EMILY's List's specific examples below, in the context of its First Amendment claims and argument that the revised rules exceed the FEC's authority by regulating nonfederal election activity.  At this point, the Court simply notes the Supreme Court's finding in *McConnell* that "[c]ommon sense dictates" that "federal candidates reap substantial rewards from any efforts that increase the number of like-minded voters who actually go to the polls."  540 U.S. at 167-68.  While EMILY's List characterizes the communications that will be impacted by the revised allocation regulations  as "wholly" nonfederal, at least some of the communications it describes could well influence federal elections, in addition to state or local elections, and are thus properly characterized as "mixed purpose" activities within the FEC's purview to regulate.  *See* Pl.'s MSJ at 35-36; FEC MSJ at 27-28.  For example, EMILY's List complains that, under 11 C.F.R. § 106.6(f) "[a] communication in support of a state legislative candidate must be paid part with federal funds if the communication mentions endorsement of the candidate by a federal officeholder who is running for reelection."  Pl.'s MSJ at 36.  "Common

34

sense," however, suggests that a communication encouraging recipients to vote for a state or local candidate in part based upon her endorsement by a federal officeholder might well influence the federal officeholder's bid for reelection by enticing those who support the federal officeholder to go to the polls and vote for both candidates.

As such, the Court rejects EMILY's List's attempt to distinguish the instant case from *McConnell*'s analysis based on a claim that the revised allocation rules impact purely nonfederal election activity.  In *McConnell*, the Court analyzed restrictions on the solicitation and spending of nonfederal funds by state and local parties as contribution limits, notwithstanding the fact that they "capture[d] some activities that affect state campaigns for nonfederal offices" "because they affect[ed] federal as well as state elections."  540 U.S. at 166.  So too, here, the Court considers the allocation regulations to be contribution limits, and thus subjects them to lesser scrutiny by asking whether they are "closely drawn" to support a "sufficiently important interest."  *Id.* at 136.

> 2.   *Wisconsin Right to Life Does Not Control The Court's Analysis in the Instant Case*

EMILY's List also argues that the revised allocation rules must be subjected to strict scrutiny in light of the Supreme Court's decision in *WRTL*, and more generally argues that *WRTL* establishes that the allocation regulations violate the First Amendment.  In contrast, the Commission and *amici* argue that *WRTL* is distinguishable from this case in several key respects, and therefore does not control the Court's analysis here.  Again, the Court finds that the Commission has the better of this argument.

*WRTL* involved an as-applied challenge to BCRA's prohibition on corporations and unions using treasury funds to make expenditures for "electioneering communications," which are

defined as broadcast, cable, or satellite communications that "refer[] to a clearly identified candidate for federal office" and are made shortly before an election and targeted to the relevant electorate.  2 U.S.C. §§ 434(f)(3)(A) and 441 b(b)(2),(c).  *McConnell* upheld these restrictions against a facial challenge, but the Supreme Court subsequently concluded that *McConnell* left open the possibility of an as-applied challenge, in the event that the bright-line definition of "electioneering communications" captured "genuine issue ads" in addition to election-related speech.  *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-12 (2006) (per curiam); *McConnell*, 540 U.S. at 207.  The non-profit corporation plaintiff in *WRTL* posed just such an as-applied challenge, arguing that its proposed ads were "genuine issue ads" free from restraint under the First Amendment.  *See generally* 127 S. Ct. 2652.  The Supreme Court agreed, finding that the First Amendment does not permit the restriction of corporate speech unless it is express advocacy or the "functional equivalent of express advocacy."  *Id.* at 2667, 2671.

WRTL* is distinguishable from the instant case in several key ways.  First, in *WRTL*, the Supreme Court applied strict scrutiny to BCRA's "electioneering communications" provision because it "burdens political speech."  *Id.* at 2664.  While EMILY's List argues that *WRTL* dictates that the Court apply strict scrutiny to the allocation regulation in this case, as discussed above, the allocation regulation does not prevent EMILY's List from engaging in political speech, *see PI Mem. Op.*, 362 F. Supp. 2d at 58, and is instead a contribution limit analyzed under lesser scrutiny.  Second, *WRTL* involved an as-applied challenge, while EMILY's List brings a facial challenge, and thus must "carr[y] [the] heavy burden of proving that [the challenged regulations are] overbroad."  *McConnell*, 540 U.S. at 207.  For these two reasons, the plaintiff's burden in *WRTL* and EMILY's List's burden in the instant case are substantially different.

EMILY's List also points out that the corporation in *WRTL* had a federally registered political committee funded with federal funds, but sought to fund its issue advertisement with its corporate treasury funds, i.e., funds not regulated by the FEC. Pl.'s MSJ at 18-19. EMILY's List claims that it "is in an identical position to the plaintiff" in *WRTL*, apparently attempting to analogize the corporation's treasury funds (not regulated by the FEC) to EMILY's List's nonfederal account. *Id.* This argument raises the third key difference between the instant case and *WRTL*: the type of entities involved. The plaintiff in *WRTL* was a corporation, while EMILY's List is a federally registered political committee. FECA defines a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A). In addition, however, in *Buckley*, the Supreme Court noted that this pure definition might raise constitutional vagueness and overbreadth problems because the requirement that "political committees" disclose their "expenditures" "could be interpreted to reach groups engaged purely in issue discussion" as opposed to federal campaign activity. *See* 424 U.S. at 79. The Court found that "[t]o fulfill the purposes of [FECA]" while avoiding constitutional concerns, "the words 'political committee' . . . need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* According to the Supreme Court, "[e]xpenditures of candidates and of 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress [because] [t]hey are, by definition, campaign related." *Id.* In contrast, for expenditures made by those other than candidates and political committees, the Court applied a narrowing gloss to avoid constitutional concerns, by

interpreting the term "expenditure" to reach "only funds used for communications that expressly advocate the election or defeat of a particular federal candidate." *Id.* at 79-80.

This discussion of *Buckley* crystalizes the difference between the plaintiff corporation in *WRTL*–an entity other than a political committee whose communications only constitute expenditures if they include express advocacy or the functional equivalent thereof–and EMILY's List–a federally registered political committee whose "major purpose" is the nomination or election of a candidate, and whose activities are "by definition, campaign related." *Buckley*, 424 U.S. at 79-80. The Supreme Court has since reaffirmed this interpretation: in *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) ("*MCFL*"), the Court noted that "should [a particular nonprofit corporation's] independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee" and thus "automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns." *Id.* at 262 (citing *Buckley*, 424 U.S. at 79)); *see also McConnell*, 540 U.S. at 169 n.64 (citing *Buckley*'s major purpose test as eliminating vagueness concerns with respect to the term "expenditure" because "political committee's expenditures 'are, by definition, campaign related'").

Further, in *California Medical Association v. FEC*, 435 U.S. 182 (1981), the Supreme Court specifically upheld the contribution limits FECA applied to nonconnected multicandidate political committees, like EMILY's List, on the grounds that they were enacted "in part to prevent circumvention of the very limitations on contributions that [the Supreme] Court upheld in *Buckley*." *Id.* at 197-98. In so doing, the Court specifically explained how, in the absence of such

limitations on contributions to political committees, FECA's "contribution limitations could be easily evaded." *Id.* Also in *California Medical Association*, the Supreme Court specifically noted the "differing restrictions" FECA placed on political committees, on the one hand, and on corporations and unions, on the other, stating that those differing restrictions "reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process." *Id.* at 201. *Accord*, *McConnell*, 540 U.S. at 158; *National Right to Work*, 459 U.S. at 210.

The FEC thus correctly stresses that, as a political committee, EMILY's List, by definition, has the major purpose of influencing federal elections, and may be regulated differently than the nonprofit corporation plaintiff in *WRTL*. For its part, EMILY's List opposes the Commission's reliance on *Buckley*'s "major purpose" test, asserting that the Commission has not defined what constitutes an organization's "major purpose" and has not included the test in its regulations. Pl.'s Reply at 8-10. EMILY's List's arguments in this respect, however, do not undercut the FEC's showing that EMILY's List's status as a political committee bears upon the manner in which it may be regulated. As an initial matter, regardless of the FEC's implementation of the major purpose test, the Supreme Court precedent discussed above makes clear that *Buckley*'s "major purpose" narrowing gloss is relevant to determining whether an organization is a political committee because it avoids constitutional vagueness and overbreadth. *See MCFL*, 479 U.S. at 262; *McConnell*, 540 U.S. at 169 n.64; *see also Shays*, 511 F. Supp. 2d 19, 30-31 (2007). Moreover, the fact that the FEC has not incorporated the major purpose test into regulations does not demonstrate that the test has not actually been applied. To the contrary, the FEC proffers evidence that it has applied the major purpose test sporadically since 1988. *See* FEC Reply at 7

(citing examples, including *Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1996), *vacated on other grounds*, 524 U.S. 11 (1998); *FEC v. Malenick*, 310 F. Supp. 2d 230 (D.D.C. 2004), *amended on reconsideration*, 2005 WL 588222 (D.D.C. Mar. 7, 2005) and FEC Advisory Opinions 2006-20 and 1988-22).  Finally, while EMILY's List is correct that the Commission has not defined the term "major purpose" in its regulations, Judge Emmet G. Sullivan recently concluded that the Commission could proceed in this regard via case-by-case adjudication rather than rulemaking. *See Shays v. FEC*, 511 F. Supp. 2d 19 (2007).  As such, the Court continues to agree with the FEC that EMILY's List, as a political committee with the major purpose of federal campaign activity, may be regulated differently from the nonprofit corporation in *WRTL*.

EMILY's List is undoubtedly correct that its status as a political committee does not automatically give the FEC authority to regulate its legitimately nonfederal election activities.  *See* Pl.'s Reply at 7.  As Judge Flannery noted in *Common Cause*, "FECA regulates federal elections only," and does not suggest that the Commission's jurisdiction "reach[es] beyond federal elections and into the realm of state elections."  692 F.Supp. at 1395.  However, EMILY's List has designated itself as a political committee registered with the FEC, and does not deny that its major purpose is federal campaign activity and that it engages in activities for the purpose of influencing federal elections.  As such, the fact that EMILY's List also engages in nonfederal activity does not insulate EMILY's List from being required to fund its federal campaign activities and mixed purpose activities with federal funds.  In short, the Court concludes that *WRTL* is distinguished from the instant case by EMILY's List's status as a political committee, the fact that it challenges contribution limits rather than electioneering communication restrictions, and its mounting of a facial challenge rather than an as-applied challenge.  Accordingly, while the Court takes *WRTL*'s

analysis and holdings into account in considering EMILY's List's First Amendment claim, it does

not consider that case dispositive of EMILY's List's claim in this case.

> ### 3.   *Applying Lesser Scrutiny to the Challenged Regulations*

Having concluded that all of the challenged regulations are subject to the lesser scrutiny

the Supreme Court has applied to contribution limits, the Court now continues to apply that

scrutiny, by asking whether the regulations are "'closely drawn' to match a 'sufficiently important

interest.'" *McConnell*, 540 U.S. at 136 (quoting *Beaumont*, 539 U.S. at 162 (quoting *Shrink*

*Missouri*, 528 U.S. at 387-88)).

> #### a.   *The Challenged Regulations Serve the Important Governmental*
> *Purposes of Preventing Corruption and the Appearance of*
> *Corruption By Foreclosing Circumvention of FECA's Rules*

As the FEC correctly notes, "[s]ince *Buckley*, the Supreme Court has repeatedly held that

the statutory contribution restrictions serve the important governmental purposes of preventing

corruption and the appearance of corruption, and has upheld measures intended to foreclose

circumvention of those provisions." FEC MSJ at 22 (citing *Buckley*, 424 U.S. at 26-28, 46-47;

*FEC v. Colorado Repub. Fed. Campaign Comm.*, 533 U.S. 431 (2001); *Beaumont*, 539 U.S. at

160; and *McConnell*, 540 U.S. at 143-45)).  Further, as explained above, the Supreme Court

specifically upheld contribution limits as applied to nonconnected multicandidate political

committees in *California Medical Association* as "an appropriate means by which Congress could

seek to protect the integrity of the contribution restrictions upheld by [the Supreme Court] in

*Buckley*."  453 U.S. at 198-99.  FECA expressly limits the contributions that political committees

may make to candidates and dictates that those contributions be funded by hard money subject to

FECA's source and amount limitations.  2 U.S.C. §§ 431(8); 441a(a)(2)(A).  The challenged

solicitation regulation, 11 C.F.R. § 100.57, which all parties agree is a contribution limit, serves to prevent the circumvention of these contribution limits by specifying when funds received by political committees in response to solicitations will be treated as contributions under FECA.

The revised allocation regulations similarly serve the important governmental purposes of preventing corruption and the appearance of corruption by foreclosing the circumvention of FECA's contribution limits.  In light of FECA's restrictions on the ability of political committees to contribute to candidates, allowing political committees to fund activities intended to influence federal elections with nonfederal funds would directly circumvent FECA's restrictions.  Indeed, in denying EMILY's List's Motion for Preliminary Injunction, the Court previously concluded "that the FEC promulgated these rules in an effort to close an oft-exploited loophole in federal election law," and "that the FEC is empowered under FECA to modify allocation rules to ensure that unregulated monies are not improperly used to influence federal elections."  *PI Mem. Op.*, 362 F. Supp. 2d at 57; *Cf. Common Cause*, 692 F. Supp. at 1395 ("[W]ith respect to federal elections, 'soft money' cannot properly be used for these activities under the FECA").

As this Court also previously concluded, "Plaintiff has not demonstrated any right, statutory or otherwise, to the former system of allocation rules."  *PI Mem. Op.*, 362 F. Supp. 2d at 55.  To the contrary, both the Supreme Court in *McConnell* and Judge Flannery in *Common Cause* have found that a system allowing political committees to allocate the costs of mixed purpose activities is not required by–and may in fact be contrary to–a strict reading of FECA's language.  *McConnell*, 540 U.S. at 123; *Common Cause*, 692 F. Supp. at 1396.  Indeed, in *McConnell*, the Supreme Court indicated that the "FEC's allocation regime" applicable to political committees prior to BCRA "subverted" the purposes of FECA by allowing political parties "to use vast

42

amounts of soft money in their efforts to elect federal candidates." 540 U.S. at 124.

Further, the record in this case reveals that the "funds expended" allocation method in place prior to the challenged revisions "allowed non-party committees to calculate the federal portions of their allocated spending at or close to zero." *PI Mem. Op.*, 362 F. Supp. 2d at 48. As the example of ACT vividly demonstrates, those allocation calculations were not always reflective of the political committees' actual spending on behalf of federal candidates or in connection with federal elections. *See Amici* Br. at 14-18. To the contrary, operating under the "funds expended" method, ACT applied an allocation ratio of 2% federal funds and 98% nonfederal funds for its administrative expenses and generic voter drives rather than the appropriate allocation of 90% federal funds to 10% nonfederal funds, and improperly characterized disbursements directly attributable to clearly identified federal candidates as "administrative expenses." FEC MSJ, Ex. 17 (Conciliation Agreement). Allegations regarding ACT's improper application of the "funds expended" method were brought to the Commission's attention during the rulemaking and are part of the rulemaking record in this case. *Amicus* Br. at 19-20.

EMILY's List nevertheless argues that because it is nonconnected political committee (as opposed to a party political committee like the ones Congress focused on in BCRA), the Commission's "concern with corruption, or its appearance, on which the regulation of federal campaign finance depends, is attenuated." Pl.'s MSJ at 20. As the Supreme Court explained in *McConnell*, however, FECA and BCRA are "premised on Congress' judgment that if a large donation is capable of putting a federal candidate in the debt of the contributor, it poses a threat of corruption or the appearance of corruption." *McConnell*, 540 U.S. at 167. EMILY's List's status as nonconnected political committee does not insulate it from that judgment. As *California*

*Medical Association* noted, Congress decided to

> impose more precisely defined limitations on the amount an individual may contribute to a political committee . . . [based] on the following considerations: first, these limits restrict the opportunity to circumvent the [] limits on contributions to a candidate; second, these limits serve to assure that candidates' reports reveal the root source of the contributions the candidate has received; and third, these limitations minimize the adverse impact on the statutory scheme caused by political committees that appear to be separate entities pursuing their own ends, but are actually a means for advancing a candidate's campaign.

453 U.S. at 199 n.18 (quoting H.R. Conf. Rep. No. 94-1057, pp. 57-58 (1976)).  Nor is the risk of corruption limited by the fact that the allocation regulations relate in part to EMILY's List's administrative expenses.

> If unlimited contributions for administrative support are permitted, individuals and groups . . . could completely dominate the operations and contribution policies of independent political committees . . . .  Moreover, if an individual or association was permitted to fund the entire operation of a political committee, all moneys solicited by that committee could be converted into contributions, the use of which might well be dictated by the committee's main supporter.  In this manner, political committees would be able to influence the electoral process to an extent disproportionate to their public support and far greater than the individual or group that finances the committee's operations would be able to do acting alone.  In so doing, they could corrupt the political process in a manner that Congress, through its contribution restrictions, has sought to prohibit.

*Id.* at 199 n.19.  Further, while FECA imposes limits on political committees' abilities to make contributions to federal candidates, *see* 2 U.S.C. § 441a(a)(2)(A), those limits would be of little value if political committees were allowed–as ACT did–to circumvent them simply by characterizing their activities or disbursements as nonfederal or not attributable to clearly identified candidates.

EMILY's List acknowledges that the FEC may "regulate reasonably in aid of enforcement of federal contribution limits."  Pl.'s MSJ at 23.  Nevertheless, EMILY's List suggests that the

44

anticircumvention goals of the solicitation and allocation regulations should no longer be considered "sufficiently important" government interests in light of *WRTL*.  EMILY's List is correct that the *WRTL* Court concluded that a prophylactic, anticircumvention rationale did not constitute the "compelling interest" required by strict scrutiny to justify regulations on electioneering communications by corporations that were not the functional equivalent of express advocacy.  *See* 127 S. Ct. at 2671-72.  However, *WRTL* expressly acknowledged that the Supreme "Court has long recognized 'the governmental interest in preventing corruption and the appearance of corruption' in election campaigns" and that "[t]his interest has been invoked as a reason for upholding *contribution* limits."  *Id.* at 2672 (emphasis in original).  As such, *WRTL* simply does not mean that the FEC's asserted anticircumvention rationale is not a "sufficiently important interest" to justify the contributions limits in this case under lesser scrutiny.

EMILY's List also argues that the "activities at issue [in this case are] outside the reach of [FECA]: nonfederal activities, conducted by a nonconnected committee active in both federal and nonfederal elections."  Pl.'s MSJ at 22.  But the Court has already rejected EMILY's List's characterization of its impacted activities as purely nonfederal in nature.  EMILY's List's attempt to rely upon *WRTL*'s rejection of a "greater-includes-the-lesser approach"–by suggesting that the FEC erroneously assumes it can regulate EMILY's List's nonfederal activities simply by virtue of its status as a political committee–is thus unavailing.  *Id.*  In *WRTL*, the Supreme Court rejected the suggestion that the FEC could legitimately regulate issue advocacy because it could regulate express advocacy.  127 S. Ct. at 2671.  Here, in contrast, the Court has already concluded that the revised regulations fall within the FEC's purview because they relate to mixed purpose activities.  *See PI Mem. Op.*, 362 F. Supp. at 56-57.  To the extent that the activities impacted by the

challenged regulations influence federal as well as nonfederal elections, they pose the same risks

of corruption and the appearance thereof that the Supreme Court addressed in *California Medical*

*Association*.  While the Court considers below whether the regulations are adequately tailored to

serve those "important" government interests, the Court finds that EMILY's List's *ipse dixit* that

its impacted activities are nonfederal in nature does not establish that they cannot be regulated in

order to avoid the circumvention of FECA's contribution limits.

> b.     *The Allocation Rules in 11 C.F.R. §§ 106.6(c) and (f) Are "Closely*
>        *Drawn" to Match These "Sufficiently Important Interests"*

The FEC summarizes the revised rule at 11 C.F.R. § 106.6(f) by stating, "[i]n sum, public

communications and voter drives referring solely to clearly identified federal candidates must be

financed solely with federal funds; those referring solely to clearly identified nonfederal

candidates may be financed with nonfederal funds; and those referring to both federal and

nonfederal candidates are subject to the time/space method of allocation under 11 C.F.R. §

106.1."  FEC MSJ at 25; *see also* 69 Fed. Reg. 68,059 (summarizing 11 C.F.R. § 106.6(f)).

Similarly, the allocation rule at 11 C.F.R. § 106.6(c) requires that political committees finance

their administrative expenses, generic voter drives, and public communications that refer to a

political party but not specific candidates with at least 50% federal funds.  11 C.F.R. § 106.6(c).

Although EMILY's List addresses the allocation regulations under the rubric of strict

scrutiny, which the Court has concluded does not apply in the instant case, a number of EMILY's

List's arguments appear to suggest that the new allocation regulations likewise do not meet lesser

scrutiny because they are not "closely drawn" to match the Government's objectives.  First,

EMILY's List correctly notes that the allocation regulations "hinge the requirement of federal

funding on a mere reference to a clearly identified candidate for federal office," in the case of 11

C.F.R. § 106.6(f), or reference to a political party, in the case of 11 C.F.R. § 106.6(c), and argues

that this standard is impermissible in light of *WRTL*'s rejection of a "mere reference" standard.

Pl.'s MSJ at 23-25. *WRTL*, however, does not establish that a "reference" standard is

impermissible in this context. *WRTL* rejected the reference standard included in BCRA's

electioneering communications regulation as it applied to a corporation, i.e., an entity other than a

candidate or political committee. 127 S. Ct. at 2667, 2671. In contrast, the reference standard in

11 C.F.R. § 106.6 applies to the speech of political committees, "the major purpose of which is

the nomination or election of a candidate," and whose activities are "by definition, campaign

related." *Buckley*, 424 U.S. at 79. Again, because the Supreme Court has repeatedly upheld

"differing restrictions" on various actors in the political arena in light of their "differing structures

and purposes," *WRTL*'s conclusions as to the nonprofit corporation in that case are not dispositive

in this case. *Calif. Med. Ass'n*, 453 U.S. at 201; *McConnell*, 540 U.S. at 158; *National Right to

Work*, 459 U.S. at 210.

EMILY's List also argues that the "breadth of the Commission's position" (by which it

apparently means to suggest a lack of close tailoring) is demonstrated by the Commission's

responses, in Advisory Opinion 2005-13, to EMILY's List's questions regarding a proposed

communication featuring Senator Debbie Stabenow of Michigan to be distributed outside of that

state. Pl.'s MSJ at 24. As EMILY's List correctly notes, the Commission found that "[r]egardless

of context," the reference to Senator Stabenow triggered a federal financing requirement, and held

that the analysis would not change if the communication instead referred to a federal candidate not

running for reelection in the year the communication was distributed. *See* Pl.'s MSJ, Attach. E

(Advisory Opinion 2005-13).  This example, however, fails to show that the allocation regulation is not closely tailored to serve the interests identified above; as *amici* note, a communication referring to Senator Stabenow might well inspire recipients outside of her home state to contribute to her campaign, and thus influence her federal election, or might otherwise raise her national profile and ultimately influence her election.  *Amicus* Br. at 42 n.48.[12]

In addition, EMILY's List offers a number of other hypothetical examples, which it claims (albeit in the context of its APA argument) demonstrate the purported overbreadth of 11 C.F.R. § 106.6.  In the context of considering a challenge to a state election law on its face, rather than in the context of an actual election, the Supreme Court has recently noted that "[i]n determining whether a law is facially invalid, [the Court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  *Wash. State Grange v. Wash. State Repub. Party*, --- U.S. ---, 128 S. Ct. 1184, 1190 (2008) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).  *Washington State Grange*, however, specifically distinguished "a second type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"  *Id.* at n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982) (quoting *Broadrick*, 413 U.S. at 615)).

---

[12]  In its motion for summary judgment, EMILY's List offers another hypothetical example of a communication that it believes demonstrates the overbreadth of the allocation and solicitation regulations, stating that "[a] communication raising funds for a political committee's program to support generally state and local candidates must be paid entirely with federal funds, as a federal election activity, if it refers to a federal candidate who has endorsed the program or otherwise vouched publicly for its effectiveness."  Pl.'s MSJ at 36.  While this hypothetical is somewhat vague, it appears to describe EMILY's List's proposed communication referencing Senator Stabenow, and as such the Court's discussion above demonstrates how it may influence federal elections.

*Washington State Grange* also asserted again that a finding of facial overbreadth is "strong medicine" and is not applied "where the parties fail to describe the instances of arguable overbreadth of the contested law." *Id.* (quoting *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)). As such, the Court addresses EMILY's List's proffered hypotheticals below, and finds that far from demonstrating "substantial overbreadth," EMILY's List's hypotheticals actually show that what EMILY's List views as "purely" nonfederal activity may quite plausibly influence federal elections as well.

Three of EMILY's List's examples involve references to clearly identified federal candidates: in one case the President running for reelection, in another two out-of-state Senators that have raised enough money to be considered federal candidates, and in the third a federal officeholder running for reelection and endorsing a state legislative candidate. *See* Pl.'s MSJ at 35-36. As the Court already accepted above, *see supra* pp. 34-35, in the last example, the communication including a federal candidate's endorsement of a state candidate might well induce voters favoring the federal candidate to go to the polls and vote for both. FEC MSJ at 28. Similarly, in EMILY's List's first example, a communication that "promotes a gubernatorial candidate, by citing his support of an incumbent President's social or fiscal policies," could prompt voters that support the President to go to the polls and vote for him in addition to the gubernatorial candidate. Finally, even in EMILY's List's second example, where the communication promotes a gubernatorial candidate on the basis of his support for legislation sponsored by two out-of-state Senators, the communication could affect an in-state federal election by "suggest[ing] that its audience support a party's full slate of candidates (federal and state) on the basis of their alliance with a prominent out-of-state candidate's policies or the out-of-

49

state candidate's support for the in-state candidates."  FEC MSJ at 28.

In *McConnell*, the Supreme Court recognized that a "campaign need not mention federal candidates to have a direct effect on voting for such a candidate" because "federal candidates reap substantial rewards from any efforts that increase the number of like-minded registered voters who actually go to the polls."  540 U.S. at 167-68.  This analysis fits with the requirement in 11 C.F.R. § 106.6(c) that a political committee's public communications that refer to a political party but not to specific candidates must be funded with at least 50 percent federal funds–suggested in EMILY's List's final example, Pl.'s MSJ at 36[13]–"because undifferentiated support of a political party denotes support of all of its candidates, federal and nonfederal."  FEC MSJ at 28.[14]

Similarly, 11 C.F.R. § 106.6(c) requires federal political committees to fund administrative expenses and generic voter drives with at least 50% federal funds.  EMILY's List suggests that this requirement is overbroad because the "allocation ratio does not depend on the relative federal activity of an organization." Pl.'s MSJ at 8.  As an example, EMILY's List posits

---

[13] EMILY's List's fifth proffered hypothetical examples poses a slightly more difficult question than the ones discussed above, noting correctly that under 11 C.F.R. § 106.6(c), a "communication supporting a political party generally and that refers to no candidates, that is run before an election in which there are no federal candidates on the ballot, must be paid for with fifty percent federal funds." Pl.'s MSJ at 36.  Nevertheless, the Supreme Court has made "clear [] that the mere fact that one can conceive of some impermissible applications of a [regulation] is not sufficient to render it susceptible to a[] [facial] overbreadth challenge."  *Taxpayers for Vincent*, 466 U.S. at 800.

[14] The same analysis applies to the ballot initiative advertisements that EMILY's List proffers in support of its standing argument, discussed above, *see* Pl.'s Attach. B, which would have to be funded with 100% federal funds under 11 C.F.R. § 106.6(f) if they referred to a clearly identified federal candidate but not to any clearly identified nonfederal candidate.  The FEC is correct that common sense suggests that "encouraging sympathetic voters to vote for the ballot measure gets them to the polls, where the endorsing federal candidate is on the ballot."  FEC MSJ at 28-29 n.24.

that "[a] political committee that spends 99 percent of its funds in state and local races must use 50 percent federal funds for its administrative and generic expenses." *Id.*[15] That hypothetical is unconvincing, however, because EMILY's List does not explain why a political committee that spends 99% of its funds on nonfederal races would be considered to have the "major purpose" of federal campaign activity, or would not choose to operate as separate federal and nonfederal committees. FEC MSJ at 33.

In short, *California Medical Association* specifically considered and determined that administrative expenses of political committees offer the potential for corruption of the political process. 453 U.S. at 199 n.19. The revised allocation regulation at 11 C.F.R. § 106.6(c) represents the Commission's judgment that, consistent with their status, political committees who are registered with the FEC and have the major purpose of campaign activity should not be allowed to fund their administrative expenses and generic voter drives with more nonfederal funds than federal funds. 69 Fed. Reg. 68,062. And, as even *WRTL* recognizes, such prophylactic anticircumvention measures have been upheld in the context of contribution limits. *See* 127 S. Ct. at 2671-72; *see also McConnell*, 540 U.S. at 676 (giving "deference to [the] congressional determination of the need for [a] prophylactic rule" requiring state and local parties to pay the salaries of employees who spend more than 25% of their compensated time on activities in connection with a federal election with 100% federal funds).

As to whether the provision in 11 C.F.R. § 106.6(f) is "closely drawn," it is significant that

_____

[15] EMILY's List also offers the example of its Campaign Corps program in attempting to argue that the allocation rule at 11 C.F.R. § 106.6(c) may inhibit nonfederal election activity. *See* Pl.'s MSJ at 14-15. As the Court concluded above, however, EMILY's List's description of that program is not sufficiently detailed to support its assertion that the program has a predominantly nonfederal purpose.

the rule provides for the allocation of costs of public communications that refer to both federal and nonfederal candidates "based on the proportion of space or time devoted to each clearly identified Federal candidate as compared to the total space or time devoted to all clearly identified candidates." *Id.* at § 106.6(f)(3)(i). This allocation method–which EMILY's List completely ignores in its briefs–is undoubtedly closely tailored because "to the extent the federal references are [a small part] of the communication, [] the federal share of the expenditure would be proportionately small under the time/space allocation rules." FEC MSJ at 28. "Conversely, if the federal candidate making the endorsement [or referenced] is prominently featured in the ad, it is reasonable to require a larger federal allocation because the ad may promote the federal candidate's own campaign as well as that of the non-federal candidate." *Amici* Br. at 42. Further, with respect to public communications that reference either only federal or only nonfederal candidates, the allocation rule at 11 C.F.R. § 106.6(f) requires that the communication be financed accordingly. While EMILY's List may be able to suggest hypothetical examples in which it would prefer to reference only a federal candidate in a communication to be sent in support of unidentified state candidates (such as its example involving Senator Stabenow), as discussed above, it cannot show that such a communication would not, in fact, influence a federal election. Moreover, "it is clear [] that the mere fact that one can conceive of some impermissible applications of a [regulation] is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800.

Finally, to the extent that EMILY's List premises its First Amendment challenge to the allocation regulations on its claim that the regulations inhibit its ability to engage in nonfederal election activity as it sees fit, that claim is insufficient to demonstrate that the regulation is facially

invalid.  As the Supreme Court has concluded, contribution limits "impose serious burdens on free speech only if they are so low as to prevent candidates and political committees from amassing the resources necessary for effective advocacy."  *McConnell*, 540 U.S. at 135.  EMILY's List cannot make such a showing here, with respect to itself, because it is undisputed that, even with the revised allocation regulations in place, EMILY's List raised more than $8.1 million in federal funds during the first three quarters of the "off-year" 2007.  *See* FEC Ex. 19.  It is likewise undisputed that EMILY's List's fundraising and spending totals in the first third of 2005-2006 and 2007-2008 election cycles exceed the totals at the same point in the comparable election cycles of 2001-2002 and 2003-2004, respectively.  FEC Stmt. ¶ 9; Pl.'s Resp. Stmt. ¶ 9.  As such, the evidence certainly does not demonstrate that the allocation regulations have prevented EMILY's List from amassing the resources necessary for effective advocacy.

EMILY's List also cannot establish that the revised allocation regulations at 11 C.F.R. § 106.6(c) and (f) are facially overbroad.  To the contrary, the discussion above reveals that the regulations are in most cases "closely drawn" to match the "sufficiently important interests" of preventing corruption and the appearance of corruption by preventing the use of federal funds for communications that may influence federal elections, and thus foreclosing the circumvention of FECA's contribution restrictions.  EMILY's List thus fails to "carr[y] [its] heavy burden of proving that" the allocation regulation is facially overbroad.  *McConnell*, 540 U.S. at 207.  "Even if [the Court] assumed that [the allocation regulation will inhibit some nonfederal election activity], that assumption would not 'justify prohibiting all enforcement' of the [regulation] unless its application to protected speech is substantial, 'not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications.'" *Id.* (quoting *Virginia v. Hicks*, 539 U.S.

113, 120 (2003)).  "Far from establishing" that the allocation regulation's application to

nonfederal activity "is substantial, either in an absolute sense or relative to its application to"

federal activity, the discussion above "strongly supports the contrary conclusion." *Id.*  As such,

the Court rejects EMILY's List's facial overbreadth challenge to the allocation regulations.

> c.    *The Solicitation Regulation in 11 C.F.R. § 100.57 Is Similarly*
> *"Closely Drawn" to Match "Sufficiently Important Interests"*

The solicitation regulation at new 11 C.F.R. § 100.57 requires a political committee to

treat all funds received in a response to a solicitation as a "contribution" under FECA if the

soliciting communication "indicates that any portion of the funds received will be used to support

or oppose the election of a clearly identified federal candidate." 11 C.F.R. § 100.57(a).  The

regulation continues, however, to provide that if the costs of the solicitation are allocable under 11

C.F.R. § 106.6: (1) funds received in response to a solicitation that refers to a clearly identified

federal candidate and to a political party, but not to a clearly identified nonfederal candidate, must

be treated entirely as contributions; while (2) funds received in response to a solicitation that

refers to a clearly identified nonfederal candidate in addition to a clearly identified federal

candidate (whether or not the solicitation also refers to a political party) must be treated as at least

50% as contributions.  *Id.* § 100.57(b).

EMILY's List suggests that the solicitation regulation is not closely drawn because it

takes an "all or nothing" approach.  Pl.'s MSJ at 29.  EMILY's List also complains that, "[f]or

purposes of the application of this rule, the FEC is indifferent to the extent to which a federal

candidate may benefit from the proceeds . . . [and] stringent limits apply to the sources or amounts

of these funds, even if the proceeds were to be dedicated to the support of nonfederal candidates."

*Id.* at 28.  These arguments, however, clearly overlook the fact that the regulation allows a political committee to consider only 50% of the funds received as a result of a solicitation to be contributions if the solicitation refers to a clearly identified nonfederal candidate in addition to indicating that the funds received will be used to support or oppose the election of a clearly identified federal candidate.  11 C.F.R. § 100.57(b).  And, to the extent that EMILY's List purports to challenge the bright-line nature of the solicitation regulation, as discussed above, prophylactic anticircumvention approaches have been upheld in the context of contribution limits.  *See WRTL,*127 S. Ct. at 2671-72; *McConnell*, 540 U.S. at 676.  Significantly, while the Supreme Court in *WRTL* noted that "[t]he desire for a bright-line rule . . . hardly constitutes the *compelling* state interest necessary to justify any infringement on First Amendment freedom," 127 S. Ct. at 2672, the parties do not dispute that the solicitation regulation is a contribution limit, which may be upheld under lesser scrutiny where it is "closely drawn to match a sufficiently important interest."  *McConnell*, 540 U.S. at 136 (quotations and citation omitted).

EMILY's List also challenges the standard in 11 C.F.R. § 100.57(a), which requires that funds received as a result of a solicitation be treated as contributions if the solicitation "indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate."  11 C.F.R. § 100.57.  EMILY's List appears to suggest that the regulation is unconstitutionally vague because the terms "indicate," and "support or oppose" are not defined and are not related to the express advocacy requirement.  EMILY's List's argument is entirely unavailing as to the words "support" or "oppose," because the Supreme Court rejected just such a claim in *McConnell*, stating that "[t]he words 'promote,' '*oppose*,' 'attack,' and '*support*' . . . 'provide explicit standards for those who apply them' and 'give the person of

ordinary intelligence a reasonable opportunity to know what is prohibited.'" 540 U.S. at 675 n.64

(emphasis added) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).  Indeed,

the Supreme Court found that was "particularly the case" in *McConnell* "since actions taken by

political parties are presumed to be in connection with political campaigns," citing to the very

same portion of *Buckley* that concluded that a political committee's expenditures are, likewise,

"by definition, campaign related."  *Id.* (quoting *Buckley*, 424 U.S. at 79).  The Supreme Court also

noted in *McConnell* that "should plaintiffs feel that they need further guidance, they are able to

seek advisory opinions for clarification, *see* 2 U.S.C. § 437f(a)(1), and thereby 'remove any doubt

there may be as to the meaning of the law.'" *Id.* (quoting *Civil Service Comm'n v. Letter Carriers*,

413 U.S. 548, 580 (1973)).

       The Supreme Court's finding in *McConnell* is dispositive of EMILY's List's vagueness

claims as to the words "support" and "oppose," and its analysis is similarly fatal to EMILY's

List's claim as to the term "indicate."  Indeed, the FEC explains that the "indicate" standard in 11

C.F.R. § 100.57 was drawn in large part from the Second Circuit's opinion in *FEC v. Survival*

*Education Fund, Inc.*, 65 F.3d 285 (2d. Cir. 1995) ("*SEF*").  In that case, the Second Circuit

considered FECA's requirement that a direct mailing "solicit[ing] any contribution" disclose its

sponsor in the mailing.  *See generally* 65 F.3d 285.  In so doing, the Second Circuit considered

*Buckley*'s conclusion that "contributions" under FECA include "dollars given to another person or

organization [independent from a political candidate] that are earmarked for political purposes,"

*see* 424 U.S. at 24 n.24, 78, and attempted to "give content to the phrase 'earmarked for political

purposes,'" *SEF*, 65 F.3d at 295.  The Second Circuit first noted that the *Buckley* Court's limiting

principle for independent expenditures is not concerned with political committees because those

organizations have the "major purpose of [] the nomination or election of a candidate." *Id.* The Second Circuit then continued to find that, for groups other than political committees that act independent of candidates, FECA required disclosure for "solicitations of contributions that are earmarked for activities or . . . 'that expressly advocate the election or defeat of a clearly identified candidate.'" *Id.* (quoting *Buckley*, 424 U.S. at 80). Finally, the Second Circuit concluded that "[e]ven if a communication does not itself constitute express advocacy, it may still fall within the reach of [FECA's disclosure requirement] if it contains solicitations *clearly indicating that the contributions will be targeted to the election or defeat of a clearly identified candidate for federal office*." *Id.* (emphasis added).

The Second Circuit thus reasonably concluded in *SEF* that funds received in response to a solicitation are contributions under FECA where the "solicitation makes plain that the contributions will be used to advocate the defeat or success of a clearly identified [federal] candidate at the polls." *Id.* Indeed, where the solicitation indicates as much, requiring that donations received in response be treated as contributions is consistent with FECA's requirement that contributions include funds given "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8). As the FEC explained in its E&J for the new solicitation regulation, "[m]any groups' fundraising solicitations will say nothing of an electoral objective regarding the use of funds . . . [c]ommunications that do, however, plainly seek funds 'for the purpose of influencing federal elections.'" 69 Fed. Reg. at 68,057.

The Court does not–and the Second Circuit clearly did not in *SEF*–find the term "indicates" to be vague, because it "provide[s] [an] explicit standard" and "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Grayned*, 408 U.S. at

108-09.  Moreover, any lingering confusion over the meaning of the term "indicates" was likely

resolved by the FEC's E&J, which provides a series of examples.  69 Fed. Reg. at 68,057.

Specifically, the FEC contrasts a solicitation stating "[t]he President wants to cut taxes again.  Our

group has been fighting for lower taxes since 1960, and we will fight for the President's tax cuts.

Send us money for our important work," with another stating "[t]he President wants to cut taxes

again.  Our group has been fighting for lower taxes since 1960, and we will fight to give the

President four more years to fight for lower taxes.  Send us money for our important work."  *Id.*

As the FEC explains, the first solicitation does not indicate that funds received will be used to

promote the President's reelection, while the second solicitation does.  The FEC also provides the

following examples, noting that the italicized language in each indicates that the solicitation will

be used to support the election or defeat of a federal candidate:

> 1.  "*Electing Joe Smith* is crucial to our efforts to preserve the environment.
> Please send money to us so that we can be successful in this cause."
>
> 2.  "Our group strives to preserve Social Security, and Representative Jones has a
> great plan to protect this vital program.  The Congressman needs *our help to stay
> in Washington* and implement his plan to save Social Security.  Give now to help
> us fight to save Social Security."
>
> 3.  "Senator Jane Doe voted against a tax package that would have helped working
> families.  Your generous gift will enable us to *make sure Californians remember
> in November*."

*Id.*  Each of these examples provides further clarification of the application of the term "indicates"

in 11 C.F.R. § 100.57.

Finally, as the Supreme Court noted in *McConnell* when considering vagueness concerns,

"should plaintiffs feel that they need further guidance, they are able to seek advisory opinions for

clarification, *see* 2 U.S.C. § 437f(a)(1), and thereby 'remove any doubt there may be as to the

meaning of the law.'" 540 U.S. at 675 n.64 (quoting *Civil Service Comm'n v. Letter Carriers*, 413

U.S. 548, 580 (1973)).  Indeed, EMILY's List did just that in its Advisory Opinion Request, when

it asked that the FEC consider three proposed options for the portion of a communication

featuring Senator Stabenow that would solicit financial support for EMILY's List's programs.

*See* Pl.'s Attach. D (Advisory Opinion Request) at 2.  EMILY's List proposed the following texts:

> (a) "We are asking for your support, so that EMILY's List can support candidates
> who, like me, could never succeed as women in politics without the combined
> commitment of all [sic] us."

> (b) "EMILY's List's support over the years for candidates like me has made an
> enormous difference to the progress of women toward equality in the pursuit of
> political office.  But we have a long way to go.  That's why I need your help."

> (c) "EMILY's List has always supported me (Senator Stabenow) when I most
> needed it.  And that is why I am asking you to support EMILY's List today, so
> that it can continue the work on behalf of women who, by seeking state office
> today, will be ready to claim national leadership tomorrow."

*Id.*  In response, the Commission concluded that EMILY's List's Examples (a) and (b) indicate

that at least some of the funds raised by the solicitation would be used to support Senator

Stabenow's reelection.  Pl.'s Attach. E (Advisory Opinion 2005-13) at 5-6.  As such, if the

solicitation only referred to Senator Stabenow, all funds received in response would be treated as

contributions, and if the solicitation also referred to a clearly identified nonfederal election, at

least 50% of the funds received would have to be treated as contributions.  11 C.F.R. § 100.57.  In

contrast, the Commission concluded that EMILY's List's Example (c) indicates that funds

received would "be used on behalf of women seeking State office," and therefore "does not

indicate that any portion of the funds received will be used to support [Senator Stabenow's] re-

election."  *Id.*  Accordingly, EMILY's List would not have to consider any funds received in

response to such a solicitation as contributions, but rather could consider them "to be donations to its non-Federal account." *Id.* at 6-7.

In light of this ample clarification, the Court rejects EMILY's List's suggestion that the term "indicates" is unconstitutionally vague. The term itself is sufficiently definite, and any concerns are alleviated by the guidance offered in the FEC's E&J and the supplemental guidance that EMILY's List received through Advisory Opinion 2005-13. Significantly, as the FEC stressed in its E&J, applying the standard in 11 C.F.R. § 100.57(a) "turns on the plain meaning of the words used in the communication and does not encompass implied meanings or understandings." 69 Fed. Reg. at 68,057. As such, the standard presents a clear guide for political committees as to which solicitations will trigger the receipt of contributions subject to FECA.

Perhaps in light of the clarity of the "indicates" standard, EMILY's List also argues that the solicitation regulation is insufficiently tailored because, as the FEC's E&J makes clear, "new section 100.57(a) applies even if the solicitation states that funds received would be used for other purposes too," *id.*, or disclaims an intent to use funds raised to promote or oppose the election of the federal candidate identified in the solicitation. Pl.'s MSJ at 31. While such a disclaimer might, at first glance, suggest that funds received in response to a solicitation should not be treated as contributions because they would not be used to influence a federal election, as discussed above, a solicitation referring to a clearly identified federal candidate (such as Senator Stabenow, in EMILY's List's example) might still serve to raise the federal candidate's national profile or encourage recipients to contribute to the federal candidate's campaign through other means. In any event, as discussed above, "it is clear [] that the mere fact that one can conceive of some impermissible applications of a [regulation] is not sufficient to render it susceptible to an

overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800.  EMILY's List has not

demonstrated that the solicitation regulation's application to nonfederal activity "is substantial,

either in an absolute sense or relative to its application to" federal activity, and therefore has failed

to "carr[y] [its] heavy burden of proving that" the solicitations regulation is facially overbroad.

*McConnell*, 540 U.S. at 207.  Instead, the discussion above demonstrates that the solicitation

regulation is "closely drawn" to match  "sufficiently important" government interests, and thus

must be upheld under the appropriate lesser scrutiny standard.

### C.    Administrative Procedure Act Claims

In addition to arguing that the revised allocation and solicitation regulations violate the

First Amendment, EMILY's List offers two challenges under the Administrative Procedure Act.

First, EMILY's List argues that the regulations exceed the Commission's statutory authority under

FECA, and second, EMILY's List argues that the regulations are arbitrary and capricious.  The

Court addresses each in turn.

### 1.    The Regulations Do Not Exceed The Commission's Authority Under FECA

EMILY's List's first claim is subject to *Chevron* review, so-called after the Supreme

Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

Under that standard, the central question for the reviewing court "is whether the agency's

construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning,

whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent*

*v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843).  In applying

*Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question

at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see also id.* at 843 n.9 ("[A]dministrative constructions which are contrary to clear congressional intent" must be rejected by the court). In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *American Fed'n of Labor & Congress of Indus. Orgs. v. Federal Election Commission*, 333 F.3d 168, 173 (D.C. Cir. 2003) ("*AFL-CIO*").

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Therefore

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges-who have no constituency-have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

*Id.* at 866 (quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)). However, "[i]f the FEC's interpretation unduly compromises the Act's purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. FEC*, 795 F.2d 156, 164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845); *see also Chevron*, 467 U.S. at 845.

As discussed above, FECA gives the Commission exclusive jurisdiction to administer, interpret, and civilly enforce FECA, as well as to "formulate policy with respect to" FECA and promulgate "such rules . . . as are necessary to carry out the provisions" of FECA. 2 U.S.C. §§ 437c(b)(1), 437d(a), and 437g. In addition, while FECA includes a definition of "contribution,"

*see* 2 U.S.C. § 431(8), EMILY's List does not dispute that further regulation of contributions falls within the Commission's delegation of authority to promulgate rules "necessary to carry out the provision" of FECA.  Pl.'s MSJ at 32.  EMILY's List also admits that Congress has not addressed–in either FECA or BCRA–allocation by nonconnected political committees.  *Id.* at 34.  As the Court has previously concluded, following the logic of the Supreme Court in *McConnell* and Judge Flannery in *Common Cause*, "the FEC's decision to allow any given allocation formula by a political committee such as EMILY's List, with respect to its expenditures intended to influence both federal and nonfederal elections [as well as to adjust that allocation formula], is within the Commission's purview."  *PI Mem. Op.*, 362 F. Supp. 2d at 56.[16]  Accordingly, both the allocation and solicitation regulations easily survive *Chevron* step one.

Furthermore, the Court's discussion of the allocation and solicitation regulations above makes exceedingly clear that the regulations are "based on a permissible construction of the statute" and thus meet *Chevron* step two review.  *Chevron*, 467 U.S. at 843.  Nevertheless, EMILY's List continues to argue that the regulations exceed the Commission's authority, rehashing a number of arguments discussed above: that the "reference" standard in the allocation regulation impermissibly regulates nonfederal election activity; that the regulations will have a deleterious impact on EMILY's List's nonfederal activity; and that the minimum 50% federal

---

[16] EMILY's List also suggests that the Commission exceeded its authority in altering the allocation regime applicable to political committees because it did not make a finding, as Judge Flannery suggested it might in *Common Cause*, that "*no* method of allocation will effectuate the Congressional goal that *all* monies spent by [] political committees on [activities that influence federal elections] be 'hard money' under the FECA."  692 F. Supp. at 1396.  Such a finding would be illogical because the Commission did not eliminate the allocation system for political committees, it altered it.  Further, as discussed above and below, the rulemaking record in this case included significant evidence–particularly in the case of ACT–that the prior "funds expended" allocation method was not effectuating Congress' goal.

funding requirement in 11 C.F.R. § 106.6(c) is not necessarily reflective of a political committee's activities.  *See* Pl.'s MSJ at 32-41.  The Court has considered and rejected each of these arguments in the course of considering EMILY's List's First Amendment claim, and declines to revisit them in the context of its *Chevron* claim.[17]  In short, EMILY's List's arguments reveal a profound policy dispute with the Commission and obvious preference for the "funds expended" allocation method previously in place.  Under the relevant case law, however, "[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail."  *Chevron*, 467 U.S. at 866.  As such, the Court rejects EMILY's List's claim that the allocation and solicitation regulations exceed the Commission's statutory authority.

> 2.      *The Regulations Are Not Arbitrary or Capricious*

Finally, the Administrative Procedure Act ("APA") provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

> The scope of review under the "arbitrary and capricious" standard is narrow and a
> court is not to substitute its judgment for that of the agency.  Nevertheless, the agency
> must examine the relevant data and articulate a satisfactory explanation for its action
> including a rational connection between the facts found and the choice made.  In
> reviewing that explanation, we must consider whether the decision was based on a
> consideration of the relevant factors and whether there has been a clear error of

---

[17] In particular, insofar as EMILY's List's claims in this respect turn on its *ipse dixit* that the revised allocation and solicitation regulations will curb its "purely" nonfederal election activity, the Court has specifically rejected EMILY's List's attempt to portray its activities in that manner.

> judgment.  Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies:  We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (hereinafter "*State Farm*") (internal citations and quotation marks omitted); *see also Cellco P'ship v. Federal Communications Commission*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (noting "arbitrary and capricious" review is "highly deferential . . . presum[ing] the validity of agency action . . . [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment.").

EMILY's List first argues that the 50% minimum federal funding requirement for political committee's administrative expenses and generic voter drives, found in 11 C.F.R. § 106.6(c), is arbitrary and capricious because "[a]llocating committees differ in their ratio of federal to nonfederal activity." Pl.'s MSJ at 41-42.  The FEC's E&J, however, explained that the 50% minimum requirement offered a clear, bright-line rule, which would "enhance compliance with the FECA, [] simplify the allocation system, and [] make it easier for [] nonconnected [political] committees to comprehend and for the Commission to administer these requirements." 69 Fed. Reg. at 68,060.  In addition, as noted above, the Commission based the 50% minimum requirement on a conclusion that, consistent with their status, federally registered political committees "should not be permitted to pay for administrative expenses, generic voter drives and public communications that refer to a political party with a greater amount of non-Federal funds

than Federal funds." *Id.* at 68,062.  Finally, the FEC explained that the revised rule "should

reduce the burden of compliance on [] nonconnected [political] committees. . . [and] best resolve

the problems with the former allocation scheme revealed through reviewing past FEC reports and

the issues raised by the commenters on the NPRM." *Id.* at 68,063.

The Commission's decision to "make ease of administration and enforceability a

consideration in setting its standard" is entirely permissible, and certainly does not demonstrate

that the allocation regulation is arbitrary and capricious.  *WorldCom, Inc. v. FCC*, 238 F.3d 449,

459 (D.C. Cir. 2001).  Further, the rulemaking record in this case amply supported the

Commission's conclusions that the prior "funds expended" allocation method proved difficult for

political committees to implement and for the Commission to administer.  Specifically, the FEC's

E&J reveals that: (1) the Commission's review of public disclosure reports in the ten years prior

to the rulemaking demonstrated that very few committees were allocating expenses under the

prior 11 C.F.R. § 106.6(c), 69 Fed. Reg. at 68,062; (2) political committees had "consistently

requested guidance on the proper application of the allocation methods under the former section

106.6 at various Commission conferences, roundtables, and education events, *id.*; (3)  the

Commission's Audit Division had discovered that some committees were not properly allocating

under the old rules, *id.*; and (4) compliance with the old allocation rule required multiple steps

because political committees had to "monitor their Federal expenditures and non-Federal

disbursements, compare their current spending to the ratio reported at the start of the election

cycle, and then adjust the ratio to reflect their actual behavior," *id.*  This evidence certainly

constitutes a reasoned basis for the Commission's conclusions.

In addition, while EMILY's List suggests that the allocation method at 11 C.F.R. §

106.6(c) is inherently arbitrary and capricious because it replaced the "funds expended" allocation method, Pl.'s MSJ at 42, as *amici* stress, the rulemaking record included strong evidence–in the form of the allegations against ACT–that political committees' allocations under that method were not always tied to reality and that the method could be easily manipulated. Moreover, EMILY's List does not dispute the FEC's finding in its E&J that many of the political committees applying the "funds expended" method already allocated more than 50% of their administrative expenses to federal funds, such that the change in regulation would have no impact on them. 69 Fed. Reg. at 68,063, 68,086. Nor does EMILY's List contest that it consistently allocated its own costs to at least 50% federal funds in the ten years prior to the revised regulations. *See* FEC MSJ, Ex. 5. In light of the foregoing evidence, which the FEC considered in its rulemaking process, the Court easily concludes that the 50% minimum federal funds requirement in 11 C.F.R. § 106.6(c) is not arbitrary and capricious.

The Court similarly concludes that the solicitation regulation is not arbitrary and capricious. EMILY's List's argument in this respect focuses on the "all-or-nothing" nature of the regulation, i.e., the fact that an indication that funds raised in response to a solicitation will be used to promote or oppose the election of a clearly identified federal candidate causes *all* donations received in response to that solicitation to be treated as contributions. Pl.'s MSJ at 43. This argument, however, again overlooks the regulation's provision that when such a solicitation also refers to a nonfederal candidate, only 50% of the funds received must be treated as contributions. 11 C.F.R. § 100.57(b). While EMILY's List asserts that the FEC has failed to justify the 50% minimum in this context, it is reasonable for the Commission to take the ease of administering and enforcing the allocation regulation into account, and even the Commission's

67

decision to rely on an "admittedly imperfect measure" would not render it arbitrary and capricious. *WorldCom, Inc.*, 238 F.3d at 459.

Finally, EMILY's List argues that the solicitation regulation is arbitrary and capricious because a disclaimer of an intent to use funds to promote or oppose a federal candidate will not trump an "indication" of an intent to do so. Pl.'s MSJ at 43. However, for the reasons discussed extensively above, the Commission has demonstrated–and explained in its E&J–why funds raised in response to solicitations indicating they will be used to promote or oppose a federal candidate should be treated as contributions under FECA. The Commission's explanation sufficiently "enables [the Court] to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Repub. Nat'l Comm. v. FEC*, 76 F.3d 400, 407 (D.C. Cir. 1996). As such, the Court rejects EMILY's List's claim that the solicitation regulation is arbitrary and capricious.[18]

## IV.  CONCLUSION

For the foregoing reasons, the Court shall DENY [32] EMILY's List's Motion for Summary Judgment and shall GRANT [34] the Commission's Cross-Motion for Summary

---

[18] EMILY's List also suggests that the revised allocation and solicitation regulations are arbitrary and capricious because the E&J does not explicitly discuss the final rules' effect on corruption or the appearance of corruption. Pl.'s MSJ at 44. The Court's discussion above makes the connection between the revised rules and the important government interests of preventing corruption and the appearance thereof abundantly clear. Moreover, as the Commission correctly notes, "[a] regulation is reasonably related to the purpose of the legislation to which it relates if the regulation serves to prevent circumvention of the statute and is not inconsistent with the statutory provisions." *Carpenter v. Sec'y of Veteran Affairs*, 343 F.3d 1347, 1352 (Fed. Cir. 2003). The regulations at issue in this case easily meet that requirement, and "it is unnecessary for an agency to prove that circumvention has occurred in the past in order to sustain an anti-circumvention regulation as reasonable; a regulation can be justified by a reasonable expectation that it will prevent circumvention of statutory policy in the future." *Id.*

Judgment.  In light of the Court's grant of summary judgment to the Commission, the Court shall

DISMISS the instant action in its entirety.  An appropriate Order accompanies this Memorandum

Opinion.

Date:   July 31, 2008

                                          _/s/_____

                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge